

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-76,406

### EX PARTE RUBEN GUTIERREZ, Appellant

### ON DIRECT APPEAL
### FROM THE 107TH JUDICIAL DISTRICT COURT
### CAMERON COUNTY

COCHRAN, J., delivered the opinion of the Court in which MEYERS, WOMACK, JOHNSON, KEASLER and HERVEY, JJ., joined. KELLER, P.J. and PRICE, J., concurred.

### O P I N I O N

Appellant appeals from two trial court orders–the first denying his request for appointed counsel to assist him in filing a motion for post-conviction DNA testing, and the second denying his motion for the testing itself. We will affirm.

### I.

### Background

Appellant was convicted of capital murder and sentenced to death for his participation in the robbery and murder of eighty-five-year-old Escolastica Harrison. Mrs. Harrison lived

with her nephew, Avel Cuellar, in a mobile-home park in Brownsville. She owned the mobile-home park, and her home doubled as the park's office. Mrs. Harrison did not trust banks, and, at the time of her murder, she had about $600,000 in cash hidden in her home. Appellant was one of the few people who knew about Mrs. Harrison's money. Mrs. Harrison had befriended appellant because he was friends with her nephew, Avel.  Appellant sometimes ran errands for Mrs. Harrison, and he borrowed money from her.  Appellant, Avel, and others routinely gathered behind Mrs. Harrison's home to drink and visit.

Appellant, then 21 years old, orchestrated a plan to steal her money.  On September 5, 1998, he and an accomplice, Rene Garcia–whom Mrs. Harrison did not know–entered Mrs. Harrison's home to carry out this plan.  A third accomplice, Pedro Gracia, was the driver.  When appellant and Rene Garcia left with Mrs. Harrison's money, she was dead. Avel Cuellar found her body late that night–face down in a pool of blood.  She had been severely beaten and stabbed numerous times.  Mrs. Harrison's bedroom was in disarray, and her money was missing.

The next day, detectives canvassed the area for information. Detective Garcia, the lead investigator, already knew that appellant's drinking buddies–Avel Cuellar, Ramiro Martinez, and Crispin Villarreal–had all said that appellant was in the trailer park the evening of the murder. Another witness, Julio Lopez, also said appellant was there.[1]

---

[1] Mr. Lopez did not know appellant.  The police showed him some "loose photos," and he picked out appellant in "a few seconds" and was "absolutely positive" about that identification. But by the time of trial, Mr. Lopez was not able to identify appellant in person.

On September 8, 1998, detectives went to appellant's home.  He was not there, but his mother said she would bring him to the police station.  The next day, appellant voluntarily came to the police station to make a statement.  He gave an alibi.  He said he had seen Avel Cuellar and another friend, Ramiro Martinez, at the trailer park on the Friday before the murder, but on the Saturday of the murder, he drove around with Joey Maldonaldo in Maldonaldo's Corvette all day long.  They were nowhere near Mrs. Harrison's mobile-home park.  When police asked him if he had his days mixed up, appellant cut off questioning. The alibi did not pan out.  Joey Maldonaldo's statement did not mesh with appellant's.

Four days later, as a result of statements given by appellant's two accomplices, Rene Garcia and Pedro Gracia, and their own investigation, the police obtained an arrest warrant for appellant.  He made a second statement.  This time, he admitted that he had planned the "rip off," but said that he had waited at a park while Rene Garcia and Pedro Gracia did it. He said that when his two cohorts came to pick him up, Rene Garcia was holding a screwdriver covered in blood and said that he had killed Mrs. Harrison.  Rene Garcia and Pedro Gracia had taken a blue suitcase and a tackle/tool box full of money.  Appellant said, "There was no doubt about the fact that I planned the whole rip off but I never wanted for either one of them to kill Mrs. Harrison.  When I saw that Pedro was grabbing the money from the tackle/tool box and heard some crumbling plastic I decided that I did not want any money that they had just ripped off."  Appellant told the police that his accomplices had told him where they had thrown the blue suitcase away. Appellant led the detectives to a remote

area, but when the officers could not find the blue suitcase, appellant was allowed out of the car, and he walked straight to it.

The next day appellant made a third statement, admitting that he had lied in his previous one "about being dropped off in the park, about not being with Rene." He said Pedro Gracia drove the truck and dropped him and Rene Garcia off at Mrs. Harrison's home. The initial plan was for Rene Garcia to lure Mrs. Harrison out of her home by asking to see a trailer lot. Then appellant would come around from the back of her home, run in, and take the money without her seeing him. But when appellant ran around to the front, Rene Garcia and Mrs. Harrison were still inside the house. Appellant said Rene Garcia knocked out Mrs. Harrison by hitting her, and then he repeatedly stabbed her with a screwdriver. The screwdriver "had a clear handle with red, it was a standard screwdriver. We had got the screwdriver from the back of the truck in a tool box along with another screwdriver, a star type." Appellant gathered the money. "When he started stabbing her, I pulled out the blue suitcase from the closet and the black tool box fell. It opened when it fell and I saw the money." Appellant tossed the tool box to Rene Garcia, and headed out the door with the blue suitcase. Rene Garcia followed, and Pedro Gracia pulled the truck around to pick them up. Pedro Gracia dropped them off down a caliche road and appellant filled "up the little tool box with the money that was in the suitcase," while Rene Garcia filled up his shirt. They abandoned the suitcase, and Pedro Gracia picked them up and drove appellant home.

Much of the money was recovered. Appellant's wife's cousin, Juan Pablo Campos,

led police to $50,000 that appellant had given him to keep safe. The prosecution's theory at trial was that appellant, either as a principal or as a party, intentionally murdered Mrs. Harrison during a robbery. The prosecution emphasized (1) the medical examiner's testimony that two different instruments caused the stab wounds,[2] (2) appellant's admission that he and Rene Garcia went inside Mrs. Harrison's home office with two different screwdrivers, and (3) the fact that four different people–Avel Cuellar, Ramiro Martinez, and Crispin Villarreal from "the drinking group" and another passerby, Mr. Lopez, who did not know appellant–all saw him at the mobile-home park the day that Mrs. Harrison was killed.

The jury was instructed that it could convict appellant of capital murder if it found that appellant "acting alone or as a party" with the accomplice intentionally caused the victim's death. The jury returned a general verdict of guilt, and, based on the jury's findings at the punishment phase, the trial judge sentenced appellant to death.

We affirmed appellant's conviction and sentence on direct appeal in 2002[3] and denied his application for a writ of habeas corpus in 2008. Appellant filed a petition for writ of habeas corpus in federal district court, but that court stayed and abated the federal proceedings to allow the appellant to pursue unexhausted state claims.

---

[2] The medical examiner testified that Mrs. Harrison suffered defensive wounds that indicated she had struggled for her life and tried to "ward off blows or attacks of some sort." He said that she was stabbed approximately thirteen times by two different instruments. One "almost certainly" was a flat-head screwdriver and the other was possibly a Phillips-head screwdriver.

[3] *Gutierrez v. State*, No. AP-73,462 (Tex. Crim. App. Jan. 16, 2002) (not designated for publication).

Appellant then filed a request for appointment of counsel under Article 64.01(c) in the original trial court. In support of his motion for counsel appellant noted he was seeking DNA testing of the following evidence:

- a blood sample taken from the victim, Escolastica Harrison;

- a shirt belonging to the victim's nephew and housemate, Avel Cuellar, containing apparent blood stains;

- nail scrapings taken from victim during an autopsy;

- blood samples collected from Avel Cuellar's bathroom, from a raincoat located in or just outside his bedroom, and from the sofa in the front room of the victim's house; and

- a single loose hair found around the third digit of the victim's left hand that was found during the autopsy.

Appellant accompanied his request with a copy of the autopsy report and lab reports, his assertion that the identity of Mrs. Harrison's killer is and was an issue at trial, and his statement that exculpatory results would support his position that he neither murdered Mrs. Harrison nor anticipated her murder. The trial judge denied the request, finding that there were no "reasonable grounds" for filing a motion for post-conviction DNA testing.[4]

Appellant filed an interlocutory appeal that this Court dismissed as premature. We held that an order denying appointed counsel under Article 64.01(c) is not an immediately appealable order under Rule 25.2(a)(2),[5] and that "[t]he better course is for a convicted

---

[4] *See* TEX.CODE CRIM. PROC. art. 64.01(c).

[5] TEX. R. APP. P. 25.2(a).

person to file a motion for DNA testing and, if and when the motion is denied, appeal any alleged error made by the trial judge in refusing to appoint counsel."[6]

Appellant then filed a motion for post-conviction DNA testing.  In it, he acknowledged that the three men involved in the robbery of Mrs. Harrison were himself, Rene Garcia, and Pedro Gracia.  But he relies on the evidence that only two people entered the home to argue that exculpatory DNA test results (results that established that he was not one of those two) would show, by a preponderance of the evidence, that he would not have been convicted of capital murder or sentenced to death.  The trial judge denied the request for testing because appellant (1) failed to meet the "no fault" provision of Chapter 64, and, alternatively, (2) failed to establish either that "identity was or is an issue in the case" or that it was more probable than not that he would not have been convicted if exculpatory results had been obtained through DNA testing.[7]

## II.

### Chapter 64 and the Standard of Review

There is no free-standing due-process right to DNA testing, and the task of fashioning rules to "harness DNA's power to prove innocence without unnecessarily overthrowing the established system of criminal justice" belongs "primarily to the legislature."[8]  In Texas,

---

[6] *Gutierrez v. State*, 307 S.W.3d 318, 323 (Tex. Crim. App. 2010).

[7] *See* Articles 64.01(b)(1)(B), 64.03(a)(1)(B) & (a)(2)(A).

[8] *District Attorney's Office v. Osborne*, 129 S. Ct. 2308, 2316 (2009).  *See also Ex parte Mines*, 26 S.W.3d 910, 914 (Tex. Crim. App. 2000) (there is no constitutional right to

Chapter 64 of the Code of Criminal Procedure requires the judge of the convicting court to

order DNA testing when requested by a convicted person if it finds all of the following:

(1)     evidence exists that by its nature permits DNA testing;

(2)     the evidence was either:

     (a)     justifiably not previously subjected to DNA testing [because DNA testing i) was not available, or ii) was incapable of providing probative results, or iii) did not occur "through no fault of the convicted person, for reasons that are of such a nature that the interests of justice require DNA testing"]; or

     (b)     subjected to previous DNA testing by techniques now superseded by more accurate techniques;

(3)     that evidence is in a condition making DNA testing possible;

(4)     the chain of custody of the evidence is sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect;

(5)     identity was or is an issue in the underlying criminal case;

(6)     the convicted person has established by a preponderance of the evidence that the person would not have been convicted if exculpatory results had been obtained through DNA testing; and

(7)     the convicted person has established by a preponderance of the evidence that the request for DNA testing is not made to unreasonably delay the execution of sentence or administration of justice.[9]

An indigent convicted person intending to file a motion for post-conviction DNA

---

post-conviction DNA testing).

[9] *See* 43B George E. Dix & Robert O. Dawson, 43B TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 45.188 (2d ed. 2001 & 2008-09 Supp.) (setting out a summary of Articles 64.01(a)-(b) & 64.03(a)-(b)).

testing now has a limited right to appointed counsel. That entitlement used to be absolute,[10] but it is now conditioned on the trial judge's finding "that reasonable grounds exist for the filing of a motion."[11] If all of the prerequisites set out above are met, the convicting court must order testing. Then, after "examining the results of testing under Article 64.03, the convicting court must hold a hearing and make a finding as to whether, had the results been available during the trial of the offense, it is reasonably probable that the person would not have been convicted."[12] Exculpatory DNA testing results do not, by themselves, result in relief from a conviction or sentence. Chapter 64 is simply a procedural vehicle for obtaining certain evidence "which might then be used in a state or federal habeas proceeding."[13]

In reviewing the trial judge's Chapter 64 rulings, this Court usually gives "almost total deference" to the trial judge's findings of historical fact and application-of-law-to-fact issues that turn on witness credibility and demeanor, but we consider *de novo* all other

---

[10] *Winters v. Presiding Judge of the Criminal Dist. Court No. Three of Tarrant County*, 118 S.W.3d 773, 775 (Tex. Crim. App. 2003) (former version of Article 64.01(c) required appointment of counsel even if the appointment would be a "useless act" because no evidence containing biological material was available for testing).

[11] *Gutierrez v. State*, 307 S.W.3d 318, 321 (Tex. Crim. App. 2010) (explaining that appointment of counsel in a post-conviction DNA proceeding is determined by three criteria: (1) defendant must inform the convicting court that he wishes to submit a motion for DNA testing; (2) the convicting court must find that "reasonable grounds" exist for filing a DNA motion; and (3) the convicting court must find that the movant is indigent); *Blake v. State*, 208 S.W.3d 693, 695 (Tex. App.—Texarkana 2006, no pet.) (trial courts must now also find reasonable grounds for the motion to be filed).

[12] Article 64.04.

[13] *Thacker v. State*, 177 S.W.3d 926, 927 (Tex. Crim. App. 2005).

application-of-law-to-fact questions.[14]

**III.**

Appellant raises five issues on appeal. The first relates to the denial of his motion for counsel; the rest relate to the denial of the motion for DNA testing. We will address each issue in turn, although they are interrelated.

**A.      Appellant is not entitled to appointed counsel because "reasonable grounds" do not exist for the filing of a motion for post-conviction DNA testing.**

1.      *Appellant's request for counsel.*

Appellant asserted that reasonable grounds exist for filing a motion for DNA testing because exculpatory results would tend to support his assertion that "he was not present during, did not participate in, and did not know or anticipate the victim's murder and is thus not guilty of capital murder."[15] The State responded that appellant's request for appointment of counsel was deficient because exculpatory test results would only "muddy the waters"[16] and would not provide any basis for habeas corpus relief. The State pointed to the following evidence in arguing that there were no reasonable grounds to file a motion: (1) appellant's

---

[14] *Routier v. State*, 273 S.W.3d 241, 246 (Tex. Crim. App. 2008).

[15] Appellant's Request For Appointment of Counsel at 4.

[16] The State, citing *Kutzner v. State*, 75 S.W.3d 427, 439 (Tex. Crim. App. 2002), also faulted appellant for not presenting an argument that, if DNA testing is performed, the possible exculpatory results would prove him to be actually innocent. As appellant points out–this is the wrong standard because 1) *Kutzner* involved a motion for forensic DNA testing instead of a request for the assistance of counsel in the preparation of such a motion, and 2) that reading of *Kutzner* has been superseded by statute, as this Court recognized *Smith v. State*, 165 S.W.3d 361 (Tex. Crim. App. 2005) (convicted person must prove that, had the results of the DNA test been available at trial, there is a 51% chance that he would not have been convicted).

statement–admitted at trial–that he was present in Mrs. Harrison's home when the murder took place and that he assisted in taking the money; (2) other trial evidence that appellant and an accomplice entered the home with two types of screwdrivers, that Mrs. Harrison's stab wounds were caused by two different instruments, and that Mrs. Harrison knew and could identify appellant; and (3) the statements of Pedro Gracia and Rene Garcia–referred to but not admitted at trial–that appellant was present in the home and participated in the robbery and murder of the victim.

The trial judge denied the request for counsel finding that appellant "has failed to allege and prove that reasonable grounds exist for a motion to be filed under Chapter 64[.]"

2.    *A finding of reasonable grounds requires more than an inarticulate hunch or intuition to suggest that exculpatory results would have changed the verdict.*

The statute does not define "reasonable grounds," but courts of appeals have developed some guiding principles.  Though a convicted person need not prove entitlement (or a prima facie case of it) to DNA testing as a precondition for obtaining appointed counsel,[17] whether "reasonable grounds" exist for testing necessarily turns on what is required for testing.  Basic requirements are that biological evidence exists, that evidence is in a condition that it can be tested, that the identity of the perpetrator is or was an issue, and

---

[17] *Lewis v. State*, 191 S.W.3d 225, 227-28 (Tex. App.—San Antonio 2005, pet. ref'd) (the statute requires only a showing of "reasonable grounds" for a motion to be filed, not the establishment of a "prima facie" case). *See In re Franklin*, No. 03-07-00563-CR, 2008 WL 2468712 at *2 (Tex. App.—Austin June 19, 2008, no pet.) (not designated for publication) ("an indigent inmate need not prove his entitlement to testing as a precondition for obtaining appointed counsel to assist him in filing a testing motion.").

that this is the type of case in which exculpatory DNA results would make a difference.[18]

Courts have found that reasonable grounds for testing are not present if no biological evidence exists or if it has been destroyed,[19] or if identity was not or is not an issue.[20] Reasonable grounds are present when the facts stated in the request for counsel or otherwise known to the convicting court reasonably suggest that a "valid" or "viable" argument for testing can be made.[21]

---

[18] Article 64.03(a)(1)(A)(i), (a)(1)(B).

[19] *Atkins v. State*, 262 S.W.3d 413, 416-17 (Tex.App.—Houston [14th Dist.] 2008, pet. ref'd) (skirting question of what "reasonable grounds" means "because appellant has failed to allege even that DNA was taken and exists"), *abrogated on other grounds by Gutierrez v. State*, 307 S.W.3d 318 (Tex. Crim. App. 2010); *James v. State,* 196 S.W.3d 847, 850 (Tex. App.—Texarkana 2006, pet. ref'd) ("A motion for post-conviction DNA testing may request testing only of evidence containing biological material 'that was secured in relation to the offense that is the basis of the challenged conviction[.]' . . . James' motion does not make this statutorily required request, nor does it allege facts which would form the basis of a finding that the motion was reasonable. Accordingly, the trial court properly denied James' request for court-appointed counsel because his application fails to show there is any reasonable ground for the application."); *Blake v. State*, 208 S.W.3d 693, 695  (Tex. App.—Texarkana 2006, no pet.) ("the trial court had evidence that no biological material still existed that could be submitted for DNA testing. We believe that this evidence provided a sufficient justification for the trial court to determine there were no reasonable grounds for the Chapter 64 motion to be filed.").

[20] *Lewis*, 191 S.W.3d at 229 ("Because Lewis' motion for post conviction DNA testing fails to meet two of the preconditions to obtaining DNA testing under Chapter 64, specifically that the evidence still exists and that identity is or was an issue in the case, it also fails to demonstrate 'reasonable grounds for a motion to be filed.'").

[21] House Research Organization, Bill Analysis, Tex. H.B. 1011, 78th Leg., R.S. (2003) (Supporters Say) ("By requiring reasonable grounds before appointing an attorney for an indigent person seeking post-conviction DNA testing, HB 1011 would weed out frivolous claims while still ensuring a person with a valid claim access to testing. . . . When in doubt, a judge would err on the side of caution and appoint a lawyer in case the convicted person had a valid claim."). *See In re Franklin*, 2008 WL 2468712 at *2 ("reasonable grounds for a testing motion are present when the facts stated in the request for counsel or otherwise known to the trial court reasonably suggest that a plausible argument for testing can be made. Conversely, reasonable grounds for a

An analogy to the Fourth Amendment distinction between "reasonable suspicion" and "probable cause" construct may be helpful:  Before appointing an attorney, the trial judge needs "reasonable grounds" to believe that (1) a favorable forensic test is a viable, fair and rational possibility, and (2) such a test could plausibly show that the inmate would not have been convicted.  Before ordering testing, the inmate must establish, by a preponderance of the evidence, "probable cause" that he would not have been convicted if exculpatory DNA results are obtained.

Alternatively, one could approach the "reasonable grounds" questions in the opposite direction.  The trial judge could simply assume that the result of any proposed DNA testing is "exculpatory" in the sense that the test will prove that the inmate is not the source of that DNA.  That is a "favorable" or "exculpatory" test result.  But if that "favorable" or "exculpatory" finding would not change the probability that the inmate would still have been convicted, then there are no reasonable grounds to appoint an attorney and no justification for ordering any testing.  A "favorable" DNA test result must be the sort of evidence that would affirmatively cast doubt upon the validity of the inmate's conviction; otherwise, DNA testing would simply "muddy the waters."[22]

3.    *Appellant does not have reasonable grounds to file a motion for DNA testing.*

---

testing motion are not present if the record before the trial court shows that DNA testing is impossible or that no viable argument for testing can be made.").

[22] *See Rivera v. State,* 89 S.W.3d 55, 59 (Tex. Crim. App. 2002) (citing *Kutzner,* 75 S.W.3d at 439).

Appellant argues that the trial judge's decision to deny his request for appointed counsel was outside the zone of reasonable disagreement because the identity of the murderer was at issue for purposes of Article 64.01. In making this argument, appellant asserts that the trial judge was not entitled to consider either appellant's third statement to police–because it was purportedly taken in violation of his right to remain silent[23]–or his accomplices' statements–because they were neither admissible nor admitted at trial and appellant has never had a chance to confront and cross-examine those accomplices.[24] Appellant further argues that, even if these statements can be considered, they are irrelevant to whether the murderer's identity is an issue for purposes of DNA testing.

First, because a person's effort to secure testing under Chapter 64 does not involve any constitutional considerations, the trial judge could properly consider the accomplices' statements. Although evidence offered against a defendant at a criminal trial and challenged on constitutional grounds must be admissible to give adequate protection to the values that exclusionary rules are designed to serve, a Chapter 64 proceeding is not a "criminal trial."[25]

---

[23] Appellant filed a pretrial motion to suppress his statements, which the trial judge denied. This Court upheld the trial judge's ruling admitting appellant's third statement on direct appeal and denied the same claim in his state writ.

[24] Appellant argues that, because he had no opportunity to cross-examine his accomplices, their testimonial statements should not be considered by any court in determining whether the murderer's identity is at issue for purposes of Article 64.01.

[25] *See, e.g., Lego v. Twomey*, 404 U.S. 477, 488-89 (1972) (exclusionary rules aim to deter lawless conduct by police and prosecution and often operate at the expense of placing probative evidence before juries for the purpose of arriving at truthful decisions about guilt or innocence); *Thompson v. State*, 123 S.W.3d 781, 784-85 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (unlike a criminal trial, a Chapter 64 proceeding is an independent, collateral inquiry

Rather, it is an independent, collateral inquiry into the validity of the conviction, in which exclusionary rules have no place, and there are no constitutional considerations.[26]   Article 64.03 does not require any evidentiary hearing before the trial judge decides whether a convicted person is entitled to DNA testing.[27]   And, if a hearing is held, the convicted person has no right to be present, no right to confront or cross-examine witnesses, and no right to have hearsay excluded or an affidavit considered.[28]   The legislature has placed no barriers to the type of relevant and reliable information that the trial judge may consider when determining if identity was or is an issue in the case. The information must be reliable, but

into the validity of the conviction).

[26] *Prible v. State*, 245 S.W.3d 466, 469 (Tex. Crim. App. 2008).  *See, e.g., Ex parte Mines*, 26 S.W.3d 910, 914 (Tex. Crim. App. 2000) (criminal defendant enjoys a presumption of innocence and a constitutional right to be present at a pretrial or trial hearing; applicant for post-conviction writ of habeas corpus enjoys neither); DIX & DAWSON, *supra*, note 9, § 45.181 (recognizing that this Court, in *Prible*, made it clear "that a convicted person's effort to secure testing to show that another person was involved in the offense involved no constitutional considerations").

[27] *Rivera v. State*, 89 S.W.3d 55, 58-59 (Tex. Crim. App. 2002) (art. 64.03 does not require a hearing of any sort concerning the convicting court's determination of whether a convicted person is entitled to DNA testing, but art. 64.04 requires a hearing after a convicted person has obtained DNA testing under art. 64.03).  *See id.* at 61 (Hervey, J., concurring) (noting that Chapter 64 does not prohibit a convicting court from exercising its discretion to conduct an evidentiary hearing with live witnesses for the purpose of resolving issues under art. 64.03).

[28] *See Thompson*, 123 S.W.3d at 784-85 ("Unlike a criminal trial, a chapter 64 proceeding such as this one does not implicate an appellant's confrontation-clause rights because this type of proceeding does not necessarily involve any witnesses or accusations against the appellant. Rather, as set forth in chapter 64, the proceeding involves a motion made by the applicant followed by the State's non-accusatory response required under the statute. This type of proceeding is analogous to a habeas corpus proceeding in that it is an independent, collateral inquiry into the validity of the conviction. Therefore, as in a post-conviction writ of habeas corpus proceeding, an applicant for a post-conviction DNA analysis enjoys neither a presumption of innocence nor a constitutional right to be present at a hearing.") (citations omitted).

it need not be admissible or previously admitted at trial.[29]   In short, in a Chapter 64

proceeding, the constitution does not bar a judge from considering statements that were (or

should have been) inadmissible at trial.   The written statements made by appellant and his

two accomplices, which were attached to the State's brief submitted to the trial judge, are as

much a part of this record as the documents in appellant's appendix.[30]

Second, these statements are highly probative of whether the murderer's identity is

an issue for purposes of DNA testing.  Appellant properly notes that confessions and witness

statements do not necessarily preclude a finding of reasonable grounds for granting a DNA

motion.  Article 64.03(b) provides that "A convicted person who . . . made a confession or

similar admission in the case may submit a motion under this chapter, and the convicting

court is prohibited from finding that identity was not an issue in the case solely on the basis

of [that] . . . confession, or admission[.]"[31] And we have held that, at least under some

---

[29] *See Hall v. State*,  297 S.W.3d 294, 298 (Tex. Crim. App. 2009) ("The court of appeals erred to hold that a Rule 702 *Kelly* gatekeeping hearing is required to show the reliability of LIDAR technology to measure speed at a hearing on a motion to suppress. Nevertheless, the court of appeals correctly held that the trial judge abused his discretion when denying Hall's suppression motion because there was no evidence that LIDAR technology, as used in this case, supplied probable cause for the stop."). *See also id.* at 300-01(Price, J., concurring) (setting out the "blue cube" theory, in which an officer testified that a person was speeding simply because a "blue cube" on his dashboard so indicated).

[30] *See, e.g.,  Ex parte Campbell,* 226 S.W.3d 418, 423-24 (Tex. Crim. App. 2007) (habeas court could properly consider exhibits attached to State's Motion to Dismiss; "His Chapter 64 request, the trial court's retesting order, the DPS results, and the trial court's findings are all attached as exhibits to the State's motion and are as much a part of this habeas record as are applicant's attachments.").

[31] TEX. CODE CRIM. PROC. art. 64.03(b).

circumstances, a witness's statement may be "irrelevant" to whether a motion for DNA testing makes identity an issue.[32]   But appellant's confession is not the sole basis for finding that identity was not an issue.  The State also points to Julio Lopez's testimony that appellant was outside of the victim's home on the evening of the murder and that he ran around to the back of the victim's home while another person went to the front door.  Mr. Lopez's testimony independently corroborates appellant's own statement concerning his actions.

Furthermore, this is not a case in which testing of biological evidence left by a lone assailant is sought.[33]   This case was tried under the law of parties, and the identity of the parties–appellant, Rene Garcia, and Pedro Gracia–was not an issue at trial, and it is not an issue now. This combination, of (1) appellant's third statement, placing him inside Mrs. Harrison's home with a screwdriver in his hand, (2) Rene Garcia's statement that places him inside Mrs. Harrison's home and stabbing her, and (3) Pedro Gracia's statement that places him inside Mrs. Harrison's home at the time of the murder, is highly probative of whether identity was or is an issue.  The trial judge is the sole judge of the credibility of these three consistent statements, all of which clearly and unequivocally place appellant inside Mrs.

---

[32] *Blacklock v. State*, 235 S.W.3d 231, 233 (Tex. Crim. App. 2007) ("That the victim testified that she knew appellant and identified him as her attacker is irrelevant to whether appellant's motion for DNA testing makes his identity an issue").

[33] *Esparza v. State*, 282 S.W.3d 913, 922 (Tex. Crim. App. 2009); *Smith v. State*, 165 S.W.3d 361, 364-65 (Tex. Crim. App. 2005).

Harrison's home at the time of her murder.  Therefore, we adopt this factual finding.[34]

Together with all the circumstantial evidence admitted at trial,[35] this information supports the

trial judge's ultimate legal ruling that there are no "reasonable grounds" for a motion to be

filed under Chapter 64.[36]

**B.      Appellant's second issue is without merit because appellant was "at fault" in not seeking DNA testing at trial.**

In his order denying DNA testing, the trial judge found that appellant failed to comply

with Article 64.01(b)(1)(B) because it was his fault that the biological material was not

previously tested during his trial.[37]

---

[34] *See Rivera v. State*, 89 S.W.3d 55, 59 (Tex. Crim. App. 2002) (in reviewing trial judge's ruling on request for DNA testing, we give almost complete deference to the trial judge's determination of historical facts and application-of-law-to-fact issues that turn on credibility and demeanor).

[35] The trial judge reasonably could have concluded that appellant, the self-admitted mastermind of the robbery and the only one of the three robbers who knew where Mrs. Harrison kept her cash, was most unlikely to tell his two cohorts the location of that money and then send them off into her house unsupervised to find the cache and bring it back as he waited patiently in the park.  Furthermore, the trial judge could have reasonably concluded that only appellant had the motive to kill the 83-year-old woman during the robbery because he was the only one of the three whom she would have immediately recognized.

[36] *See Rivera*, 89 S.W.3d at 59 ("[T]he ultimate question of whether a reasonable probability exists that exculpatory DNA tests would prove innocence is an application-of-law-to-fact question that does not turn on credibility and demeanor and is therefore reviewed *de novo*.").

[37] Specifically, the court noted that:
Defendant did have the opportunity to inspect all physical evidence in the State's possession before trial began including those specific items listed in his motion. There has been no complaint raised regarding ineffective assistance of trial counsel for any alleged failure to have an independent expert appointed, to have testing performed on any evidence, or to request a continuance prior to trial so these matters could be done.  Trial counsel advised this Court, prior to trial, that after reviewing the evidence it would make any such requests if it deemed

1.      *Defendants must, in the usual case, avail themselves of DNA technology available at the time of trial.*

If DNA testing was not done at the time of trial, the convicted person must show that (a) DNA testing was not available; (b) DNA testing was available "but not technologically capable of providing probative results"; or (c) no DNA testing occurred "through no fault of the convicted person, for reasons that are of such a nature that the interests of justice require DNA testing."[38]  Because the biological materials a convicted person seeks to subject to post-conviction testing under Chapter 64 are, by definition, in  the State's possession at the time of trial, convicted persons cannot simply rely on the State's possession at the time of trial to invoke the no-fault provision of Subsection (b)(1)(B).[39]  Rather, the person must make a more particularized showing of the absence of fault under Article 64.01(b)(1)(B) because Chapter 64 requires "defendants to avail themselves of whatever DNA technology may be available at the time of trial."[40]   If trial counsel declines to seek testing as a matter of reasonable trial strategy, then post-trial testing is not usually required in the interest of justice.  "To hold otherwise would allow defendants to 'lie behind the log' by failing to seek

necessary.  No such requests were made and no objections were lodged.  Thus, fault is attributable to the "convicted person" as to why the biological material was not previously subjected to DNA testing.

[38] TEX. CODE CRIM. PROC. art. 64.01(b).

[39] *Routier v. State*, 273 S.W.3d 241, 247 (Tex. Crim. App. 2008).

[40] *Id.* at 248.  As long as it would have been apparent to the movant at the time of trial that the evidence containing biological material would "have discrete and independent probative value, the overall import of the statute mandates that she seek such testing at that time, or forego testing later." *Id.*

testing because of a reasonable fear that the results would be incriminating at trial but then

seeking testing after conviction when there is no longer anything to lose."[41]

2.    *Appellant made a considered decision to forgo DNA testing at trial.*

Appellant points out that, although the physical evidence was made available to the

defense team for inspection, it was not made available until the Friday before the Monday

trial.  Appellant argues that this was too late because "a motion for a relatively lengthy

continuance would have been pointless."[42]  That is, he argues, the motion would have been

denied, and that denial would have been affirmed on appeal.[43]  But this is sheer speculation,

unsupported by the record.   The record reflects that appellant filed a pre-trial motion to

inspect physical evidence on February 5, 1999, and the judge granted it on March 18, 1999.[44]

---

[41] *Skinner v. State*, 293 S.W.3d 196, 202 (Tex. Crim. App. 2009) (Conversely, "evidence that counsel provided constitutionally ineffective assistance in failing to seek DNA testing of certain items could be sufficient to show that the failure to test was not appellant's fault 'for reasons that are of a nature such that the interests of justice require DNA testing.' The reasoning behind permitting challenges to the effectiveness of a trial attorney's representation is that '[a]n accused is entitled to be assisted by an attorney . . .  who plays the role necessary to ensure that the trial is fair.'").

[42] Appellant's Brief at 27.

[43] *Id.*

[44] The following colloquy occurred during the hearing.

State:      Okay. Motion to inspect, examine and test physical evidence, Judge, that's their– I'm not–I don't know if they want to do independent testing. That's not been brought to my attention. I'm not sure what the status of that is today. Once again, they can look at it. If they want to do independent testing, I need to know because the lab in Austin–I mean, in McAllen will have to assist us in getting the evidence ready to ship somewhere.

Defense:    Judge, with this motion, we're asking for any type of physical evidence. For example, there was blood samples that were taken, fingerprints that might have

After that inspection, the defense never made any motion for independent testing of the evidence, for an appointment of an independent expert, or for a continuance. And no claim or showing of ineffective assistance has been made or is apparent here.

Although there is no explicit explanation from counsel why he did not ask for testing, counsel's strategy became clear at trial. Appellant used the fact that the Brownsville Police Department failed to test the evidence containing biological DNA evidence to argue the lack of investigation and the existence of reasonable doubt during the trial. Appellant cross-examined the crime-scene investigator Juan Hernandez about the fingernail scrapings and the fact that they were not tested. Counsel asked similar questions about other apparent blood samples that were collected–blood on a raincoat, in bathrooms, on the screen door to the garage, and on the couch. During his closing argument, defense counsel repeatedly stated that the Brownsville Police fell down on the job.[45]

---

been taken, fingerprint -- I'm sorry, fingernail scrapings that were taken from the victim.
> We're asking that, first of all, we be allowed to inspect them. I know that the Department of Public Safety still has them in their possession. And we're simply asking for us to be allowed to inspect them. If at that time we deem it necessary to have them examined by experts, then we would urge -- we would require that at that time or ask for that at that time.
> . . .

Court:     Okay, For the record, I'll go ahead and grant the motion for the inspection and examination of the physical evidence.

[45] Defense closing arguments included the following statements:

\* "Escolastica Harrison had some -- some scrapings on her fingertips. That -- those scrapings would tell you who the killer is. Those scrapings, if they were tested, they would tell you who is the individual that killed Escolastica Harrison."

Because the record affirmatively shows that DNA testing was available to appellant before trial on the very items that he requests be tested now, and defense counsel apparently did not have testing performed on those same items because of sound trial strategy,[46] the trial judge did not err in finding that the appellant failed to meet the unavailability requirement of Article 64.01(b)(1)(B).  We adopt his finding.

**C.     Appellant has not shown that "the single loose hair" that he would like to have tested currently exists or could be delivered to the convicting court.**

---

\*      "Besides the scrapings, she also had some hair. She had a hair on her fingernails also. Did they test this for you? No. That's the job of the D.A.'s Office. That's the job of the Brownsville Police Department. They need to go ahead and show you as much evidence as they have, as much evidence as they can."

\*      "But what did the Brownsville Police Department do? They don't do this. Why? Because in this type of case, probably in any other type of case, what their initial thing to do is to try to get a voluntary statement."

\*      "If they do not get a statement from any of the individuals, they need to do some work. They need to go ahead and send the scrapings to be tested. They need to do further investigation."

\*      "In this kind of case, they would probably -- what they're doing is trying to go ahead and get the easy way out. The easy way out is to try to get a statement from the individuals."

\*      "He also stated that there was a foot in the blood. Did they check into that? No. Did they bring you any information as to that? No. They just tell you there was something on there, but why check into it? They're going to get voluntary statements. Why check into it further?"

\*      "That's–as to the Brownsville Police Department, that's what mainly everybody does. They give voluntary statements. Why look for the scrapings? Why look for anything else? Why try to go ahead and investigate further? For what? We know that everybody's going to give a voluntary statement."

\*      "He also testified that there was blood in the toilet, on Ruben's toilet. He also testified that there was blood also on the doorknob and on the floor of the toilet. That's what the officers testified to. Did they check into that? No."

\*      "Nobody went to get the fingerprints. Nobody went over to try to go ahead and dust for fingerprints. Nobody did anything but get voluntary statements."

[46] *Skinner v. State*, 293 S.W.3d 196, 202 (Tex. Crim. App. 2009) (if trial counsel declined to seek testing because of a reasonable fear that the results would be incriminating at trial, post-trial testing is not usually required by the interests of justice).

In his third issue, appellant claims that the trial court's finding that "the single loose hair" found in Mrs. Harrison's hand during the autopsy "does not exist because it was never recovered as evidence"[47] is not supported by the record.   In its response to appellant's motion, the State explained that all of the items for which appellant requested testing, except for the single loose hair, were in the custody of either the Brownsville Police Department or the Texas Department of Public Safety-McAllen Crime Lab.  The State informed the trial judge that, after making inquiry and further review, it did not find that "the single loose hair" was ever collected as evidence.  That hair was identified during the autopsy by Dr. Dahm who stated that he believed he gave it to the Brownsville Police Department.  But there was no other indication in the record that it was collected or given to the police.  Rather, "The single loose hair is not identified by the Texas Department of Public Safety in its March 17, 1999 report as being evidence submitted to it by the Brownsville Police Department."

1.    *The State's duty to investigate the existence of the evidence.*

Article 64.02 requires the attorney representing the State to take one of the following actions in response to a motion for DNA testing: 1) deliver the evidence to the court, along with a description of the condition of the evidence; or 2) explain in writing to the court why

---

[47] The trial judge specifically found the following:
In reviewing State's response pursuant to Tex. Code Crim. Proc. art. 64.02, the Court finds that DNA evidence, specifically the single loose hair described in Defendant's motion, does not exist because it was never recovered as evidence in the investigation of the case and there is no record of a chain of custody for the single loose hair.  The Court finds that the non-existence of this piece of evidence was not caused by any bad faith of the State.

the State cannot deliver the evidence to the court.[48]  If the trial judge "finds that the State has not exercised due diligence in attempting to locate the evidence, the court certainly has implied authority to order those responsible for the safekeeping and custody of the evidence to conduct a further search."[49]  But, if the trial judge finds, as a factual matter, that the evidence no longer exists and its disappearance is not caused by the bad faith of the State, the requested item simply is not available for DNA testing.

2.    *The trial judge reasonably found that "the single loose hair" was never recovered as evidence.*

Appellant argues that the State's assertion that the single loose hair "was never recovered" is contradicted by the autopsy report and Dr. Dahm's testimony.  Thus, he argues that the judge's factfinding is not entitled to deference, especially because the trial judge failed to conduct further inquiry given such direct contradiction by the medical examiner.

The State responds that the convicting court was entitled to rely on its explanation for why it could not deliver the single loose hair to the court. We agree.  Dr. Dahm's testimony was that he believed that he had submitted the hair.

> Q.    When you were conducting your autopsy, am I correct in stating that you found a piece of hair or loose–a single loose piece of hair around Escolastica Harrison's third digit upper left hand?
> A.    I believe so, yes, sir.
> Q.    And what is it that you did with that loose piece of hair?
> A.    I believe it was submitted to the police.

---

[48] TEX. CODE CRIM. PROC. art. 64.02.

[49] *In re State*, 116 S.W.3d 376, 384-85 (Tex. App.—El Paso 2003, no pet.) (orig. proceeding).

But the police do not have it.  And there is no record that they ever had it.  The trial judge

acted well within his discretion in crediting the State's representation that the hair had not

been collected, despite Dr. Dahm's belief that he had submitted it to the police.  We adopt

the trial judge's ruling that the hair is not available for DNA testing.

**D.    The trial judge acted within his discretion in finding that identity was not and is not an issue in this case.**

Appellant asserts that identity was an issue at trial because appellant argued that,

although he planned the robbery, "he was not present at the scene of the offense, did not plan

the victim's murder, did not participate in the victim's murder, did not know that his co-

defendant's intended to commit murder, and could not have reasonably anticipated that his

co-defendants intended to commit murder."[50]  In support of this assertion, appellant again

argues that the trial judge could not consider the three statements by all three participants that

appellant was inside Mrs. Harrison's home at the time she was murdered.  We resolved this

argument against appellant in his first issue.  The three statements could be considered in this

Chapter 64 proceeding, and they are highly probative.[51]  The considerable circumstantial

---

[50] Appellant contends that, under his theory, "the two men present at the scene of the offense were Rene Garcia and Pedro Gracia.  DNA testing that identified Pedro Gracia (or indeed any other male other than Gutierrez or Rene Garcia) as the donor of the blood and/or tissue samples taken from the victim and/or the scene of the offense would establish that Gutierrez was not, in fact, the second man."  Appellant's Motion for Forensic DNA Testing at 7.

[51] *See, e.g., In re McBride*, 82 S.W.3d 395, 397 (Tex. App.–Austin 2002, no pet.) (identity not at issue where prior DNA test inculpated defendant, even though that test was not admitted into evidence).

evidence and inferences from that evidence bolster the reliability of the statements.  The convicting court had sufficient information to support his finding that the identity was and is not an issue and that appellant was directly involved in the murder of Mrs. Harrison.

**E.    Appellant has failed to establish, by a preponderance of evidence that he would not have been convicted of capital murder if exculpatory results had been obtained through DNA testing.**

Appellant asserts that only two individuals entered Mrs. Harrison's home, and that favorable DNA test results would prove that he was not one of them, which would, in turn, establish a 51% chance that he either would not have been convicted of capital murder or would not have been "death-eligible."  The State responds that appellant cannot show that he would not have been convicted of capital murder if exculpatory results are obtained because such results do not "sufficiently preponderate against the totality of the evidence placing the Defendant at the scene of the murder."

1.    *The convicted person must establish, by a preponderance of the evidence, that he would not have been convicted if exculpatory DNA results are obtained.*

Under Article 64.03, a convicted person is not entitled to DNA testing unless he first shows that there is "greater than a 50% chance that he would not have been convicted if DNA testing provided exculpatory results[.]"[52]  The burden under Article 64.03(a)(2)(A) is met if the record shows that exculpatory DNA test results, excluding the defendant as the donor of the material, would establish, by a preponderance of the evidence, that the defendant

---

[52] *Prible*, 245 S.W.3d at 467-68; *see also Wilson v. State*, 185 S.W.3d 481, 484 (Tex. Crim. App. 2006).

would not have been convicted. Such was the case in *Blacklock v. State*,[53] where we held that the defendant's motion for DNA testing fairly alleged, and showed by a preponderance of the evidence, "that the victim's lone attacker is the donor of the material for which appellant seeks DNA testing."[54] In cases involving accomplices, the burden is more difficult because there is not a lone offender whose DNA must have been left at the scene.[55] And DNA testing would frequently confirm that the material belongs, as one would expect, to the victim of the crime. The bottom line in post-conviction DNA testing is this: Will this testing, if it shows that the biological material does not belong to the defendant, establish, by a preponderance of the evidence, that he did not commit the crime as either a principal or a party?[56]

2.    *Appellant has not established, by a preponderance of the evidence, that he would not have been convicted if exculpatory results had been obtained through DNA testing.*

---

[53] 235 S.W.3d 231(Tex. Crim. App. 2007).

[54] *Id.* at 232-33. *See also Esparza v. State*, 282 S.W.3d 913, 922 (Tex. Crim. App. 2009) ("In sexual assault cases like this, any overwhelming eye-witness identification and strong circumstantial evidence . . . supporting guilt is inconsequential when assessing whether a convicted person has sufficiently alleged that exculpatory DNA evidence would prove his innocence under Article 64.03(a)(2)(A).").

[55] In *Whitaker v. State*, 160 S.W.3d 5 (Tex. Crim. App. 2004), we held that testing blood found on the gun used as the murder weapon and finding that it did not belong to the defendant in a case involving three conspirators would not be exculpatory since the blood could have belonged to the victim or one of the other co-conspirators, or it could have been left on the rifle prior to the murder. *Id.* at 9.

[56] *See, e.g.*, *Prible v. State,* 245 S.W.3d 466, 470 (Tex. Crim. App. 2008) ("without more, the presence of another person's DNA at the crime scene would not constitute affirmative evidence of the appellant's innocence" requiring relief under Chapter 64); *Bell v. State,* 90 S.W.3d 301, 306 (Tex. Crim. App. 2002) (holding that evidence of another person's DNA, if found on hair, cigarette butt, and blood-stained bath mat collected from crime scene, does not constitute affirmative exculpatory evidence).

The available evidence that appellant wants tested and what it could show is as follows:

(1)    A blood sample from Mrs. Harrison.
       The DNA from Mrs. Harrison will undoubtedly be her own, not appellant's. There is no evidentiary value in testing this.

(2)    A shirt belonging to Avel Cuellar containing apparent blood stains.
       There is no reason to think that DNA from this shirt would belong to appellant or to the murderers. It should belong to Mrs. Harrison from when Mr. Cuellar discovered her body, stepped in the pool of blood around her, and picked her up, getting blood on his shirt.

(3)    Blood samples collected from Avel Cuellar's bathroom and from the sofa in the front room.
       Again, there is no reason to think that DNA from these blood samples would belong to appellant or to the murderers.

(4)    Fingernail scrapings taken from Mrs. Harrison.
       This is the only material that might conceivably contain DNA from the murderers.

But a test showing that appellant's DNA was not in those scrapings would not establish his innocence. First, there is no evidence to suggest that the 85-year-old victim was able to hit or scratch her murderers with her fingernails as they attacked her and stabbed her thirteen times in the face and neck. Second, even if some DNA were found in Mrs. Harrison's fingernail scrapings, there is no way of knowing whether it came from one of her murderers. Third, any DNA from her murderers might just as likely have come from appellant's accomplice, Rene Garcia, and that would not exculpate appellant. The only conceivable "exculpatory" result would be DNA from the third accomplice, Pedro Gracia, in the fingernail scrapings. But is this plausible? All three robbers agreed that Pedro Gracia

was the driver and did not go inside Mrs. Harrison's home. Appellant, not Gracia, was seen running around the back of Mrs. Harrison's home the evening of the murder. And it defies common sense to think that appellant, who freely admitted that "I planned the whole ripoff," told his cohorts where Mrs. Harrison's secret stash of cash was hidden and then sent them, without supervision, off to rob her while he waited patiently for their return at a park far away. That scenario is not believable. And the trial judge was not required to believe it.[57]

But even if one accepted such an implausible scenario, exculpatory nail scrapings would not make it less probable that appellant "planned the ripoff" and was a party to Mrs. Harrison's murder. Chapter 64 deals only with testing evidence that could establish, by a preponderance of the evidence, that the person "would not have been *convicted* if exculpatory results" were obtained.[58] The statute does not authorize testing when exculpatory testing results might affect only the punishment or sentence that he received.[59] In this case, even supposing that a DNA test result showed Gracia's DNA in the fingernail scrapings taken from Mrs. Harrison, this evidence would, at best, show only that Gracia, rather than appellant, was the second stabber in the house. It would not establish that

---

[57] *Rivera*, 89 S.W.3d at 60.

[58] TEX. CODE CRIM. PROC. art. 64.03(a)(2)(A).

[59] *See Kutzner v. State*, 75 S.W.3d 427, 437-42 (Tex. Crim. App. 2002) (concluding, after lengthy analysis of legislative language and intent, that statute was intended to provide testing only for those who would not have been "prosecuted or convicted" of the offense had the exculpatory test results been previously available, not for those who might show a "different outcome unrelated to the convicted person's guilt/innocence"); *Torres v. State*, 104 S.W.3d 638, 642 (Houston [1st Dist.] 2003, pet. ref'd) ("[W]e hold that a defendant may not seek forensic DNA testing for the purpose of affecting the punishment assessed.").

appellant, who admittedly masterminded "the rip-off," was not a party to Mrs. Harrison's murder.[60] And, even if Chapter 64 did apply to evidence that might affect the punishment stage as well as conviction, appellant still would not be entitled to testing. Appellant would still have been death-eligible because the record facts satisfy the *Enmund/Tison* culpability requirements that he played a major role in the underlying robbery and that his acts showed a reckless indifference to human life.[61]

In sum, granting DNA testing in this case would "merely muddy the waters." Appellant does not seek testing of biological evidence left by a lone assailant, and a third-party match to the requested biological evidence would not overcome the overwhelming evidence of his direct involvement in the multi-assailant murder. Having overruled all of appellant's points of error, we affirm the convicting court's orders denying the request for appointment of counsel and denying the motion for forensic DNA testing pursuant to Texas Code Criminal Procedure Chapter 64.

Delivered: May 4, 2011
Publish

---

[60] *See Rivera*, 89 S.W.3d at 60 (finding that the absence of the victim's DNA from underneath the defendant's fingernails would not have supported the probability of his innocence in light of defendant's confession which was corroborated by independent evidence; "Even if one concluded that negative test results supplied a very weak exculpatory inference, such an inference would not come close to outweighing [defendant's] confession.").

[61] *Tison v. Arizona,* 481 U.S. 137 (1987) (Eighth Amendment does not prohibit death penalty as disproportionate in case of defendant whose participation in felony that results in murder is major and whose mental state is one of reckless indifference); *Enmund v. Florida*, 458 U.S. 782 (1982); Article 37.071(2)(b)(2).