

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-77,108

**RUBEN GUTIERREZ, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL FROM DENIAL OF MOTION FOR FORENSIC DNA TESTING IN CAUSE NO. 1998-CR-1391-A FROM THE 107TH JUDICIAL DISTRICT COURT CAMERON COUNTY

*Per curiam.*

## O P I N I O N

Appellant appeals from a trial court order denying his third motion for post-conviction DNA testing filed pursuant to Texas Code of Criminal Procedure Chapter 64.[1] In this motion, Appellant seeks testing of the same items for which he sought testing in his first two motions, and the trial court has again denied his request. Appellant raises

---

[1] References to Chapters or Articles are to the Texas Code of Criminal Procedure unless otherwise specified.

two points of error on appeal.  After reviewing the issues, we find Appellant's points of

error to be without merit.  Consequently, we affirm the trial court's order denying testing.

*I.  Background*

In the opinion regarding Appellant's first motion for DNA testing, we summarized

the facts of the case as follows:

> Appellant was convicted of capital murder and sentenced to death
> for his participation in the robbery and murder of eighty-five-year-old
> Escolastica Harrison.  Mrs. Harrison lived with her nephew, Avel Cuellar,
> in a mobile-home park in Brownsville.  She owned the mobile-home park,
> and her home doubled as the park's office.  Mrs. Harrison did not trust
> banks, and, at the time of her murder, she had about $600,000 in cash
> hidden in her home.  Appellant was one of the few people who knew about
> Mrs. Harrison's money.  Mrs. Harrison had befriended appellant because he
> was friends with her nephew, Avel.  Appellant sometimes ran errands for
> Mrs. Harrison, and he borrowed money from her.  Appellant, Avel, and
> others routinely gathered behind Mrs. Harrison's home to drink and visit.

> Appellant, then 21 years old, orchestrated a plan to steal her money.
> On September 5, 1998, he and an accomplice, Rene Garcia—whom Mrs.
> Harrison did not know—entered Mrs. Harrison's home to carry out this
> plan.  A third accomplice, Pedro Gracia, was the driver.  When appellant
> and Rene Garcia left with Mrs. Harrison's money, she was dead.  Avel
> Cuellar found her body late that night—face down in a pool of blood.  She
> had been severely beaten and stabbed numerous times.  Mrs. Harrison's
> bedroom was in disarray, and her money was missing.

> The next day, detectives canvassed the area for information.
> Detective Garcia, the lead investigator, already knew that appellant's
> drinking buddies—Avel Cuellar, Ramiro Martinez, and Crispin
> Villarreal—had all said that appellant was in the trailer park the evening of
> the murder.  Another witness, Julio Lopez, also said appellant was there.

> On September 8, 1998, detectives went to appellant's home.  He was
> not there, but his mother said she would bring him to the police station.
> The next day, appellant voluntarily came to the police station to make a

statement.  He gave an alibi.  He said he had seen Avel Cuellar and another friend, Ramiro Martinez, at the trailer park on the Friday before the murder, but on the Saturday of the murder, he drove around with Joey Maldonaldo in Maldonaldo's Corvette all day long.  They were nowhere near Mrs. Harrison's mobile-home park.  When police asked him if he had his days mixed up, appellant cut off questioning.  The alibi did not pan out.  Joey Maldonaldo's statement did not mesh with appellant's.

Four days later, as a result of statements given by appellant's two accomplices, Rene Garcia and Pedro Gracia, and their own investigation, the police obtained an arrest warrant for appellant.  He made a second statement.  This time, he admitted that he had planned the "rip off," but said that he had waited at a park while Rene Garcia and Pedro Gracia did it.  He said that when his two cohorts came to pick him up, Rene Garcia was holding a screwdriver covered in blood and said that he had killed Mrs. Harrison.  Rene Garcia and Pedro Gracia had taken a blue suitcase and a tackle/tool box full of money.  Appellant said, "There was no doubt about the fact that I planned the whole rip off but I never wanted for either one of them to kill Mrs. Harrison.  When I saw that Pedro was grabbing the money from the tackle/tool box and heard some crumbling plastic I decided that I did not want any money that they had just ripped off."  Appellant told the police that his accomplices had told him where they had thrown the blue suitcase away.  Appellant led the detectives to a remote area, but when the officers could not find the blue suitcase, appellant was allowed out of the car, and he walked straight to it.

The next day appellant made a third statement, admitting that he had lied in his previous one "about being dropped off in the park, about not being with Rene."  He said Pedro Gracia drove the truck and dropped him and Rene Garcia off at Mrs. Harrison's home.  The initial plan was for Rene Garcia to lure Mrs. Harrison out of her home by asking to see a trailer lot.  Then appellant would come around from the back of her home, run in, and take the money without her seeing him.  But when appellant ran around to the front, Rene Garcia and Mrs. Harrison were still inside the house.  Appellant said Rene Garcia knocked out Mrs. Harrison by hitting her, and then he repeatedly stabbed her with a screwdriver.  The screwdriver "had a clear handle with red, it was a standard screwdriver.  We had got the screwdriver from the back of the truck in a tool box along with another screwdriver, a star type."  Appellant gathered the money.  "When he started stabbing her, I pulled out the blue suitcase from the closet and the black tool

box fell.  It opened when it fell and I saw the money."  Appellant tossed the
tool box to Rene Garcia, and headed out the door with the blue suitcase.
Rene Garcia followed, and Pedro Gracia pulled the truck around to pick
them up.  Pedro Gracia dropped them off down a caliche road and appellant
filled "up the little tool box with the money that was in the suitcase," while
Rene Garcia filled up his shirt.  They abandoned the suitcase, and Pedro
Gracia picked them up and drove appellant home.

Much of the money was recovered.  Appellant's wife's cousin, Juan
Pablo Campos, led police to $50,000 that appellant had given him to keep
safe.  The prosecution's theory at trial was that appellant, either as a
principal or as a party, intentionally murdered Mrs. Harrison during a
robbery.  The prosecution emphasized (1) the medical examiner's testimony
that two different instruments caused the stab wounds, (2) appellant's
admission that he and Rene Garcia went inside Mrs. Harrison's home office
with two different screwdrivers, and (3) the fact that four different
people—Avel Cuellar, Ramiro Martinez, and Crispin Villarreal from "the
drinking group" and another passerby, Mr. Lopez, who did not know
appellant—all saw him at the mobile-home park the day that Mrs. Harrison
was killed.

The jury was instructed that it could convict appellant of capital
murder if it found that appellant "acting alone or as a party" with the
accomplice intentionally caused the victim's death.  The jury returned a
general verdict of guilt, and, based on the jury's findings at the punishment
phase, the trial judge sentenced appellant to death.

*Ex parte Gutierrez*, 337 S.W.3d 883, 886-88 (Tex. Crim. App. 2011) (footnotes omitted).

This Court affirmed Appellant's conviction and sentence.  *Gutierrez v. State*, No. AP-
73,462 (Tex. Crim. App. Jan. 16, 2002) (not designated for publication).

In April 2010, Appellant filed in the trial court his first Chapter 64 motion for
DNA testing.  In the motion, Appellant acknowledged that three men were involved in the
Harrison robbery:  himself, Rene Garcia, and Pedro Gracia.  Relying on the premise that
only two people entered the home, Appellant argued that exculpatory DNA test results

would show that he would not have been convicted of capital murder or sentenced to death.  Appellant alternatively attempted to show that Harrison's nephew, Avel Cuellar, was the true perpetrator of the offense.  This Court upheld the trial court's denial of the testing, holding that favorable results would not have established by a preponderance of the evidence that Appellant would not have been *convicted*—a showing required by the statute.  *See Ex parte Gutierrez*, 337 S.W.3d 883, 900-01 (Tex. Crim. App. 2011).

In June of 2019, Appellant filed his second Chapter 64 motion for post-conviction DNA testing.  He sought testing of the same items that he requested testing on in his first DNA testing motion.  Appellant argued that, had the jury learned of a third party profile on the items collected as evidence (implying that Cuellar was the actual killer), it would not have convicted him or sentenced him to death.  Again the trial court denied the request, holding in pertinent part that Appellant had not "shown by a preponderance of the evidence that a reasonable probability exists that defendant would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing." This Court affirmed the trial court's denial of testing.  *Gutierrez v. State*, No. AP-77,089, slip op. at 18-19 (Tex. Crim. App. Feb. 26, 2020) (not designated for publication).

Sometime after this Court affirmed the denial of Appellant's second motion for DNA testing, Appellant filed a civil rights action in federal district court under 42 U.S.C. Section 1983.  *See Skinner v. Switzer*, 562 U.S. 521, 533-34 (2011) (stating that inmates may vindicate procedural due process rights, as they arise in the context of requests for

post-conviction DNA testing under state statutes, through 42 U.S.C. § 1983 litigation).

Article 64.03 requires a convicted person to show that he "would not have been *convicted*

if exculpatory results had been obtained through DNA testing."  Art. 64.03(a)(2)(A)

(emphasis added).  Appellant asserted that he should have had access to DNA testing to

show that he would not have been sentenced to death.  In March 2021, the federal district

court granted Appellant a declaratory judgment, concluding that

> giving a defendant the right to a successive habeas petition for innocence of
> the death penalty under Texas Code of Criminal Procedure Article 11.071 §
> 5(a)(3) but then denying him DNA testing under Texas Code of Criminal
> Procedure Article 64.03(a)(C)(2)(A) unless he can demonstrate innocence
> of the crime is fundamentally unfair and offends procedural due process.

*Gutierrez v. Saenz*, No. 1:19-CV-185, slip op. at 14-15 (S.D. Tex. Mar. 23, 2021).  In

other words, the federal district court held that due process requires that testing must be

permitted not just when favorable test results would undermine the movant's *conviction*,

but also when favorable test results would undermine the movant's *death sentence*,

consistent with Article 11.071 § 5(a)(3).

## II.  *The Current Chapter 64 Motion and the Trial Court's Ruling*

Based on the federal district court's declaratory judgment, Appellant in July 2021

filed a third motion for DNA testing.  In this motion, Appellant seeks to obtain DNA

testing of the same items for which he twice previously sought testing.  He argues that,

should exculpatory DNA results be obtained, a jury would not answer the punishment

special issues in a way that would require the judge to sentence Appellant to death.  In

other words, he argues that exculpatory results would show that he is "innocent of the death penalty." Finally, Appellant argues that the law of the case doctrine does not bar granting this DNA motion because the prior motions "were made under a version of the [DNA] statute that has since been declared unconstitutional by a federal judge."

In its initial response to Appellant's present DNA motion, the State filed a plea to the jurisdiction. Therein, the State argued that, because the federal district court had declared the statute unconstitutional, there was no legitimate statutory authority for DNA testing, no legal basis allowing Appellant to claim entitlement to it, and no jurisdiction in the trial court to grant it. The trial court granted the State's jurisdictional plea and dismissed Appellant's DNA motion for want of jurisdiction. Appellant appealed that ruling.

On appeal, this Court noted that state courts are not bound by the decisions of the lower federal courts. *Gutierrez v. State*, 663 S.W.3d 128, 131 (Tex. Crim. App. 2022). Further, we held that the federal court's opinion regarding Article 64.03's constitutionality did not divest the convicting court of jurisdiction to determine whether Appellant is entitled to the DNA testing he seeks.[2] *Id*. We vacated the convicting court's order and remanded the case to that court for further proceedings. On remand, the convicting court denied Appellant's third request for DNA testing, ruling that the request was "collaterally estopped, barred by the doctrine of res judicata, and barred by the

---

[2] The Court also found that nothing in the federal opinion purported, in any way, to invalidate what Chapter 64 already legitimately authorizes. *Id*.

doctrine of law of the case."  Appellant now appeals this ruling.

### III.  Appellant's Arguments on Appeal and the Court's Analysis

On appeal, Appellant raises two points of error.  In his first point, Appellant argues that the district court "wrongly concluded" that Appellant's Chapter 64 motion is collaterally estopped and barred by the doctrines of res judicata and law of the case.  Appellant argues that the district court erred in its ruling because, before this motion, Appellant "has never filed a motion for DNA testing based on a federal judgment declaring Chapter 64 unconstitutional."

While Appellant may accurately state that he "has never filed a motion for DNA testing based on a federal judgment declaring Chapter 64 unconstitutional," he *has* previously argued that, by limiting Chapter 64 to innocence (a finding that he would not have been convicted), he was denied his due process rights.  In fact, in both of his previous DNA motions and appeals, Appellant argued that:  (1) he should have been able to have the biological evidence tested, not just to show that he would not have been convicted, but also to show that he was "innocent of the death penalty"; and (2) the failure to recognize this as a valid basis for DNA testing under the statute deprives him of due process.  In both opinions on appeal, this Court rejected those arguments.  *See Gutierrez*, 663 S.W.3d at 129 (referring to the rulings in the prior opinions).

Specifically, in our opinion affirming the trial court's denial of Appellant's first DNA motion, we stated:

> Chapter 64 deals only with testing evidence that could establish, by a preponderance of the evidence, that the person "would not have been *convicted* if exculpatory results" were obtained.  The statute does not authorize testing when exculpatory testing results might affect only the punishment or sentence that he received.  In this case, even supposing that a DNA test result showed Gracia's DNA in the fingernail scrapings taken from Mrs. Harrison, this evidence would, at best, show only that Gracia, rather than Appellant, was the second stabber in the house.  It would not establish that Appellant, who admittedly masterminded "the rip-off," was not a party to Mrs. Harrison's murder.  And, even if Chapter 64 did apply to evidence that might affect the punishment stage as well as conviction, Appellant still would not be entitled to testing.  Appellant would still have been death-eligible because the record facts satisfy the *Enmund/Tison*[3] culpability requirements that he played a major role in the underlying robbery and that his acts showed a reckless indifference to human life.

*Gutierrez*, 337 S.W.3d at 901 (footnotes omitted).  We adopted this reasoning in the opinion affirming the denial of his second DNA motion in which he raised a similar argument.  *See Gutierrez*, No. AP-77,089, slip op. at 18-19.  And this reasoning continues to apply here.  *Even if* Chapter 64 applied to evidence affecting the punishment stage, given the evidence in this case, Appellant cannot show that the jury would have answered the punishment issues differently should he obtain exculpatory DNA results.  Given the evidence presented, the statute did not operate unconstitutionally as to Appellant, and the trial court properly concluded that the merits of Appellant's argument have already been addressed and decided adversely to him.  Appellant's first point of error is overruled.

In his second point of error, Appellant argues that the Court "should wait to rule

---

[3] *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v. Arizona*, 481 U.S. 137 (1987) (Eighth Amendment does not prohibit death penalty as disproportionate in case of defendant whose participation in felony that results in murder is major and whose mental state is one of reckless indifference).

on the merits of [Appellant's] appeal until the federal courts have finished the appellate process and determined whether the declaratory judgment on which this motion is based is still good law." Appellant concedes that the Fifth Circuit has reversed the federal district court's declaratory judgment. *See Gutierrez v. Saenz*, 93 F.4th 267, 269 (5th Cir. 2024). However, he asserts that he has filed a petition for rehearing en banc and a petition for panel rehearing.[4] In addition, Appellant asserts that he might also file a petition for a writ of certiorari in the United States Supreme Court. Thus, he contends, it would be premature for this Court to adjudicate the merits of his DNA motion now because the federal appeals could render this appeal moot.

As we noted above and in a previous opinion issued in this case, state courts are not bound by the decisions of the lower federal courts. *Gutierrez*, 663 S.W.3d at 131 (*citing Johnson v. Williams*, 568 U.S. 289, 305 (2013)). Although we are obligated to follow a ruling from the United States Supreme Court, holding this case for the *possibility* that the Supreme Court might issue such a ruling is both speculative and inefficient. Plus, the fact that Appellant has an execution date set for July 16, 2024, makes it imperative that we timely resolve the issues currently before the Court. Appellant's second claim is overruled.

Having found no error, we affirm the convicting court's order denying the motion

---

[4] As of this writing, it appears that the Section 1983 case has been dismissed with prejudice. *See Gutierrez v. Saenz*, No. 1:19-CV-185 (S.D. Tex. June 18, 2024) (order of dismissal and revised final judgment).

for forensic DNA testing pursuant to Chapter 64.  No motions for rehearing will be entertained and the Clerk of this Court is instructed to issue mandate immediately.

Delivered:           June 27, 2024
Do Not Publish