02-11-398-CR









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00398-CR

 

 


 
 
 Ronald Michael Hill
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE
 
 


 

 

----------

FROM THE 396th
District Court OF Tarrant COUNTY

----------

MEMORANDUM
OPINION[1]

----------

I.    
Introduction

In one
point, Appellant Ronald Michael Hill appeals the trial court’s denial of his
motion for DNA testing.  We affirm.

II.  
Factual and Procedural Background

After
Hill pleaded guilty to the murder of fifteen-year-old I.S., who bled to death in
her family’s living room on March 15, 2005, a jury convicted him and assessed
his punishment at life imprisonment, and the trial court sentenced him
accordingly.  On appeal, Hill challenged his competency to stand trial and the
voluntariness of his absence during trial, and we affirmed his conviction.  See
Hill v. State, No. 02-06-00094-CR, 2007 WL 866476, at *1, 7–9 (Tex.
App.—Fort Worth Mar. 22, 2007, pet. ref’d) (mem. op., not designated for
publication), cert. denied, 552 U.S. 1202 (2008).

A.
Hill’s Motion for DNA Testing

In
2009, Hill filed a motion requesting DNA testing of the following items
collected after the murder:  (1) a swab of a knife-shaped blood stain on the
cushion of a rocking chair at the victim’s house; (2) a swab of a blood stain from
the victim’s front door; (3) swabs from a pay phone; and (4) hairs from a
bathtub in the victim’s house.

To
his motion, Hill attached the Arlington Police Department case report, which
included several reports by police officers made over the course of the
investigation.  He also included his July 14, 2010 affidavit and his wife’s
August 10, 2010 affidavit.  The trial court granted Hill’s motion to take
judicial notice of all filings in his case, the reporter’s record of his trial,
and any and all exhibits admitted at his trial.

1. 
Police Investigation Records and Trial Record

I.S.’s
parents left the house for work before 6 a.m. on March 15, 2005.  I.S., who was
a high school student, was on spring break.  According to the police investigation
records and testimony at trial by Arlington Police Detective Richard Nutt,
I.S.’s home phone showed that a call had come from a pay phone with number
817-465-9750 at 6:55 a.m. on March 15.  Detective Nutt located the pay phone bearing
that number at a Walgreens within walking distance—a block to two blocks—from
I.S.’s home.[2]  Arlington Police crime
scene investigator Ignacio Acosta testified that he processed the pay phone’s
receiver for fingerprints but that he was unable to obtain any quality latent
prints from it.

The Walgreens
March 15, 2005 sales transaction records from between 6:30 a.m. and 7:30 a.m.
revealed a transaction for the purchase of condoms and a pregnancy test at 7:02
a.m. with a debit card.  The store’s video surveillance of that transaction
showed a black male wearing dark clothing and a cap.

Police
traced the debit card used at the Walgreens to Hill, and his card account
records showed the purchase at Walgreens at 7:02 a.m., followed by a purchase
of gas at a Kroger in Mansfield, around five miles away, at 8:21 a.m.[3] 
The account records also showed a purchase at a nearby Lowe’s in Arlington at
9:56 a.m., and Detective Nutt testified that the police recovered the Lowe’s
surveillance videotape, which showed that Hill had completely changed his
clothing from what he had worn earlier at Walgreens.  The account records also
show a charge for Dave & Buster’s in Dallas at 1:13 p.m.

When
I.S.’s father found I.S.’s body around 2 p.m., she was lying on the floor with
a pillow on her face.  Dr. Marc Krouse, the deputy chief medical examiner who
performed I.S.’s autopsy on March 16, stated that I.S. had a cluster of
superficial stab wounds on the upper part of her neck and then three deeper
cuts, one of which was lethal, on the lower front of her neck.  Dr. Krouse
determined that the resulting blood loss from I.S.’s partially cut internal
jugular vein is what killed her, and he ruled her cause of death a homicide.

Hill
and I.S. were both members of Quest Personals, a telephone chat line, and Quest
and SBC both confirmed that Hill’s home phone number was 817-375-1767.  SBC also
provided I.S.’s home phone records, which showed that between March 7 and March
15, I.S.’s home received over thirty calls from 817-375-1767, ranging in length
from only a few seconds to over an hour.  I.S.’s parents testified that they
did not know anyone with the phone number 817-375-1767.

Hill
had a white, two-door 1995 Lincoln Mark VIII and a maroon 2001 Dodge Intrepid. 
Jakeeta Taylor, the manager of a Braum’s located across the street from the
Walgreens near I.S.’s home, told police that she saw a white, two-door vehicle
parked on the north side of the Braum’s parking lot and saw a black male, who
was wearing a cap, pacing in the parking lot; she also saw him walk north along
Matlock.  She identified Hill from a photo lineup as the man she saw.

When
police interviewed Hill on April 1, 2005, he confirmed that he worked a
midnight shift (11 p.m. to 7 a.m.) and that he was married and had three
children at home and a fifteen-year-old daughter, Quashunda, who did not live
with him.  Hill acknowledged using Quest but he denied knowing I.S. or having
had a relationship with her.  When asked about the calls from his phone number
to I.S.’s home, Hill could not account for them.  Hill first told police that
after he left work on Tuesday, March 15, at 7 a.m., he went straight home and
did not stop anywhere.  At Hill’s trial, Detective Nutt testified that by the
time of the interview, police had already verified with Hill’s employer that Hill
had not gone to his 11 p.m.-to-7 a.m. shift on March 14, 2005.

When
police informed Hill about the video from Walgreens that showed him making a
purchase on March 15, Hill said he had forgotten about that and said that he
woke up and did not feel well, so he went to Walgreens and bought some cold
medicine.  Then, when informed that the police had obtained the register tape
and had seen that he had bought condoms and a pregnancy test, Hill admitted
that he had bought those items and said that he had purchased them for a
girlfriend that he had “on the side.”  He asked police not to tell his wife
about the affair.  Hill refused to give police the name of his girlfriend,
saying that it was “confidential.”

When
police told Hill that a video of him at Lowe’s had been obtained and showed
that he had changed clothes, Hill was unable to explain why he had changed
clothes.  When they told Hill that I.S. had been pregnant[4]
and that they had a warrant for Hill’s DNA, Hill told them to take his DNA and
compare it because he did not know I.S. so there was no way he could be the
donor.

Police
investigation records state that three days after Hill’s interview, his wife
Sharnise told police that she had visited Hill in jail and that he told her
that he had purchased the condoms and pregnancy test for his daughter Quashunda. 
Sharnise asked them to interview Quashunda.

Quashunda’s
mother, Sharonda, told police that Hill had called her and told her that police
were accusing him of killing a fifteen-year-old girl and that he had nothing to
do with it.  Hill spoke with Quashunda, who told Sharonda and the police that
Hill asked her to lie to Sharnise and the police and say that Hill had
purchased some condoms and a pregnancy test for her.  At Hill’s trial, Quashunda
testified that Hill called her on April 3, 2005, and asked her to tell Sharnise
that he had bought the pregnancy test and condoms for her because he did not
want Sharnise to know that he was having an affair.  Prior to Quashunda’s
testimony at his trial, Hill attempted to show to some of his family members
the following note, which was admitted in evidence and published to the jury:

Evon, Kesha, Momma, y’all
have to go and get Quashunda.  They want her to take the stand.  She can’t be
allowed to do that.  You’ll need to get her and take her to Grandma’s house
until the trial is over.  She cannot testify at all.  And I will have to have
someone to claim the pregnancy test, someone to say I was sexually involved
with them during the month of February and they thought they was pregnant
because they missed the cycle.  It was a one-time deal and nothing else.  The
case goes away with that, and one person who could be used is Visa or Christie.
 Otherwise, I’m in trouble.

 

Hill,
2007 WL 866476, at *1.

Detective
Nutt interviewed inmate D’Juan Gipson on April 27, 2005.[5]
 At Hill’s trial, Gipson testified that in April 2005, while they were in jail
together, Hill told him that he had killed I.S., and Gipson described their conversation:

[Hill] said he met her like March the
2nd on a Quest chat line and that they talked for a few days and they hooked
up.  He said they had sex inside his wife’s car.

. . . .

He told me that on the day that he
killed her, that he went to Walgreen [sic], bought some condoms and a pregnancy
test.  He said that he went to her house and knocked on the door.  He didn’t
knock—with his finger rung the doorbell, knocked on the door with his finger. 
That she came to the door and that he asked was she going to let him in.  So
she let him in.

So he was telling her that, he said,
you can’t be pregnant, she’s like, yeah, I’m pregnant.  So he said that he got
a wife and four kids and this can’t be happening.

. . . .

And that, well, she let him in.  He
was telling her that he had a wife and four kids, she couldn’t be pregnant.  So
she said that, yeah, I’m pregnant, and she needed $500 and a cell phone.  He
was like, why you need $500, a cell phone?  She said because her parents had
took her phone because of a bill or something.  He was like, man, I can’t give
you $500 and a cell phone.

So he said that she was sitting in the
chair, he got behind her and he started—he was showing me like he got behind
her, put her in a head lock and he was choking her until she passed out.  So he
said he laid her on the ground.  He felt her pulse and the pulse was still
beating, so he went to the kitchen and got a knife, and he came in and cut her
throat.[[6]]

After he cut her throat, he said that
he went back and got the trash can—a trash bag out of the kitchen and put all
the stuff inside the trash bag.  He said he walked to the front door to make
sure there wasn’t nobody outside.  He looked, wasn’t nobody outside, he walked
across the grass and he walked back to his car that he had parked behind a
Braum’s or something.[[7]]

. . . . 

After he got—put the stuff inside the
trash bag, he said he was walking back to the car, and before he got inside the
car, he looked and he had blood on his sleeve, so he turned his shirt inside
out and got in the car.  He said that he put the trash bag on the console of
the car.  He drove home.  He changed clothes in the garage.

After he changed clothes, he got his
son.  They supposed to be going fishing that day with his father, something,
the plans got cancelled.  He said after he drove around Dallas, he say—he had a
baseball cap on backwards.  He said he had a dark one, a dark-colored baseball
cap or something, he threw it over in Dallas and the clothes he threw in the
trash can and he drove around.

. . . . 

He told me she was 15 years old.  At
first he told me that she told him that she was a senior at UTA.  And then he
came and told me that he found out she was 15 years old.

Gipson
then described a conversation that he had with his girlfriend about Hill:

I didn’t give her any details about
what he told me, but I told her that he trying—at first he was trying to get me
to find somebody that I can say the rubbers and pregnan[cy] test was for.  I
was like, man, I don’t know, I’m in enough trouble now, I don’t know.

So I told her, I said, man, this dude
want[s] me to find—see can I get a girl to say the rubber and the condoms and
the pregnan[cy] test was for, she’s like, no, I don’t want nothing to do with
that.  So that’s when I had her contact the Arlington Police Department.

Gipson’s
original plea offer of forty years was reduced to twenty-five years in exchange
for his testimony.

Gipson
also testified that Hill told him that the trash bag he stole from I.S.’s kitchen
was a black trash bag.  I.S.’s mother testified that she had changed out the
black kitchen garbage bag the night before the murder for a fresh one and that
it was there when she left for work.  I.S.’s father said that he had not
removed it.

John
Densmore, another inmate, testified that he and Hill shared a cell in April
2005, and that Hill told him the following:

He told me that he had called her and
made plans to go to her house, that he had went by Walgreens on the corner of
Matlock and Green Oaks and purchased a pregnancy test, some condoms, and went
to her house.

And when he got to her house, she took
the pregnancy test and it turned up positive, and they argued amongst each
other about whether or not she would have an abortion so that her having the
baby wouldn’t affect the fact that he was married and his raising of his
family, his kids and having a happy family.  And she said that she was not
going to have an abortion and if she was pregnant, she was going to have the
baby.

And they argued and argued, and that
he left the house, went to Matlock and Bardin to an EZ Mart convenience store
to purchase gas for his car, but his credit card wouldn’t work at the pump.  So
he left, went back toward her house, stopped at what was an Eckerds—what used
to be an Eckerds between the Jack in the Box and Braum’s at Matlock and Green
Oaks, walked around the parking lot for a little while just thinking to himself
how he could convince her to have an abortion.

He said that someone from the Braum’s
come out and questioned him if he was all right, if he needed help or
anything.  He told them he was fine.  He walked back to her house, and they argued
some more and that she wouldn’t relent on the fact that she was going to have
the child if she was pregnant.

And he had gotten a knife out of the
kitchen, cut her throat, left her in the living room floor, put a pillow over
her body so that whoever come in the house wouldn’t immediately know, I guess,
that she was deceased, walked out of the house, went back to his car, went to
his house, said he woke his two sons up because they were going to go to some
kind of outing or something.  I don’t remember, I don’t recall what the outing
was.  Left from his house, went to Matlock and Mansfield Webb Road to a Kroger
and got some gasoline and went back to pick his kids up, and I guess they went
and did whatever.

Densmore
said that he was familiar with the neighborhood where everything happened
because his mother lived near there.  He also said that when Hill learned that
Densmore’s mother was a Walgreens employee, he asked Densmore to ask his mother
if she could view the videotape footage of him in the store, and if so, whether
she could get a copy of it for him and his wife.  Densmore said that he asked
his mother, and his mother told him that she could not.  Densmore and Gipson
were friends and talked about what each had heard from Hill in October 2005,
but Densmore said that Gipson had not asked him to back up his story and that
he did not know that Gipson had made a deal in exchange for his testimony.

The
police investigation records also reflected that police searched I.S.’s room
and found several men’s names and phone numbers, which they checked, as well as
information on an open sexual assault investigation involving I.S., who was
reported to have engaged in consensual sex with adult males that she met on
telephone chat lines.

The
investigation records also reflected that on March 16, 2005, at around 6:45
a.m., Kenneth J. Randolph, a black male, drove up to the crime scene and spoke
with an officer.  Randolph told the officer that he was a family friend and
knew I.S. and that he had talked to I.S. about talking to people on chat lines
and told her that anyone could just come right in her house and kill her and no
one would know.  Randolph said that he had come to the house the day before
when he found out that I.S. was dead and told his friends who were there with
him that the perpetrator could be standing among them and the police would not
know it because the police were portrayed on television as being very stupid.  Randolph
kept his right hand in his pants pocket and appeared to be playing with his
genitals while he talked with the officer and looked at I.S.’s house.  Randolph
said he could not go to work that morning because he had been up all night
thinking about I.S.’s death and that he was too upset.

A
code enforcement officer told police that the fence was down between I.S.’s
street and Cornfield Street, and that he had knocked on I.S.’s door at around
12:50 p.m. on March 15, but no one had answered.  A neighborhood mail carrier
told police that around 1:45 p.m. on March 15, he saw two teenage males walking
west on Cornfield, but when they saw him, they quickly turned around and walked
back the way they had come.

In
addition to other evidence collected, police submitted right and left
fingernail cuttings from I.S. to a DNA laboratory, but neither blood nor
tissue-like material were detected from these.  Neither spermatozoa nor acid
phosphatase, which is suggestive of semen, were detected from I.S.’s vaginal,
oral, or anal specimens; acid phosphatase was also not detected on the perineal
swabs or I.S.’s underwear.  No analysis was conducted on the swabs from the pay
phone.  Presumptive tests for blood were positive for the cushion from the
rocking chair and the front door swab.

2. 
Hill’s Affidavit

In
his July 14, 2010 affidavit, Hill averred that he did not murder I.S. and
stated the following:

On March 15, 2005 I awoke around 6:30 a[.]m[.] and put my
clothes that I had on the day before on, that was on the left side of the bed. 
I spoke briefly to my wife as she asked me why I always gets [sic] up early.  I
left to go to Walgreens in my Dodge Intrepid that is used as my wife[’s] car. 
I went to Walgreens and made a purchase for a pregnancy test and condoms then I
left coming back home.  I was gone for about 20–30 minutes when I arrived at
home and I beg[an] talking to my wife about why she always keep the car on E
fuel level.  Then I asked her what she wanted to do today with the kids.  Then
I asked my wife for her Kroger discount gas card.  I then left the room and
walked to my sons[’] room.  [J.H.] and [D.H.] were up watching cartoon
network.  I beg[a]n talking to them then we started wrestling with each other. 
After we played for about 10–15 minutes I asked them what they wanted to do
today.  [D.H.] said fishing, then I asked [J.H.] and he said he didn’t care.  I
told them to make their beds and straighten their room and get dressed.  I left
went to Krogers to get some gas for 10–15 minutes, then I came right back
home.  When I got back home I changed into what I was going to wear for the
day, then me and my sons left to go to my dad[’]s house to go fishing.  We left
in the Dodge Intrepid and stopped on Camp Wisdom and Cedar Hill State Rd to a
spot people usually fish at to see if the fish was bitting [sic].  A police
officer pulled behind us and told us that was private property and we couldn’t
go there.  We spoke for about 5–10 minutes then we left to go get my [d]ad in
Dallas on Kiest and Ledbetter.  We got there about 9:00 or a little before.  My
dad said he changed his mind to go fishing because it was cold and his hands w[ere]
hurting.  I told him to tell the boys and he promised next week.  We talked for
a little bit then we left.  We came back to Arlington but stopped at Loews
[sic] to get some weed killer for the grass.  After we left Loews [sic] we came
back home to find my wife and daughter getting dressed.  She asked what
happened and I told her my dad changed his mind and I asked her what she wanted
to do.  She wasn’t sure so I said lets go and we’ll figure it out on the way. 
So we spoke about the Imax movie we wanted to see called under water creatures
in 3-D.  We drove to Cinemark Imax in Dallas on 635 LBJ and Josey Lane to the
theater.  We got there around noon but the movie didn’t start for a couple of
hours.  Then my wife said she was hungry so we went to David [sic] Busters.  We
all ordered lunch and ate then we played games.  We got there about 12:30 or so
and stayed there until about 4:00 p[.]m.  We left and came back to Arlington
and made it ho[m]e about 5:00 p[.]m[.] and went in the living room to watch
T.V.  Thats when we saw breaking news on T.V. about a death in Arlington and
the young girl on the news went to Timberview High school.  Then the kids asked
could they go outside and I said yes but be back before dark.  That[’]s what
was done on March 15, 2005.  I did not commit the murder of [I.S.], nor was I
ever at her home or ever met her personally.

3. 
Sharnise’s Affidavit

In
her August 10, 2010 affidavit, Sharnise set out the following facts:

On March 15, 2005[,] my husband,
Ronald Hill woke up at about 6:00–6:30 A.M. or so.  I remember him getting out
of bed as I asked why he always got up early.  We spoke briefly, then he put
his clothes on and left the house to go to the store.  He came back home
shortly and we talked about our plans for the day with the kids. He then asked
me for my Kroger card and why I always kept the car on empty.  After 30
minutes, he left saying he was going to get gas.  He came back in about 15
minutes or so.

He told me he and the boys were going
to go fishing with his dad and he and the boys left together.  I started
cleaning up, got dressed and combed my hair.  They all returned a few hours
later and said Ronald’s dad changed his mind about fishing that day.

Ronald asked me what I wanted to do
that day.  I wasn’t sure so he said let’s go and will figure it out on the
way.  As we were in the car we talked about the IMAX Theater for a movie we
wanted to see in 3-D.  We drove to Cinemark in Dallas off of 635 LBJ &
Josey Lane or Webb Chapel to Cinemark IMAX Theater.  It was around 12 noon when
we got there but the movie didn’t start for a couple of hours.  I mentioned I
was hungry and we ended up at Dave & Buster’s.  We arrived and ordered
lunch and played video games.  We were there for several hours and left around
4 p.m.

We headed back home to Arlington. 
When we arrived home we went into the living room.  We sat on the couch to
watch TV.  On the news, we saw a story about the death of a girl in Arlington. 
The whole family was in the living room watching the news.  The news mentioned
the deceased girl attended Timberview.

The kids asked if they could go
outside.  Ronald told them to make sure to be in the house before dark.  They
went outside and we continued watching TV.

Ronald’s attorney, Edwin J.
Youngblood, never asked me about my knowledge of Ronnie’s activities on the day
in question.  I would’ve been willing to tell him and to testify in court.  I
even asked about a private investigator to help get answers but the attorney
Mr. Youngblood said the District Attorney had already done an investigation and
there was no need.  If asked by Edwin Youngblood I would’ve testified to the
facts.  I didn’t attend the last day of Ronald’s trial due to threats by the
victim’s family but would’ve testified on Ronald’s behalf if called as a
witness to these events.

B. 
State’s Response to Hill’s Motion

In
its response to Hill’s motion, the State argued that identity was not and is
not an issue in the case and that DNA testing would not exonerate Hill but
rather just “muddy the waters.”  Among other things, to its response the State
attached the affidavit of Edwin J. Youngblood, Hill’s former trial counsel,
which Youngblood filed in response to Hill’s application for writ of habeas
corpus alleging ineffective assistance of counsel, and the sealed record of the
hearing on Youngblood’s motion to withdraw prior to Hill’s trial.[8]

Youngblood
incorporated his letter to Hill into his affidavit, stating that if Hill had
not passed a note seeking to hide a witness and to create perjured testimony,
he probably would have been found not guilty and noting that Hill had made
numerous admissions to him that he had murdered I.S.  Youngblood also revealed
the following in his affidavit:

Had the Court conducted a formal
hearing as to my client’s competence to stand trial, and had I been compelled
to testify as to my opinion, I would have testified that Mr. Hill was competent
in my opinion.  If further forced to explain my opinion, I would have testified
that Mr. Hill:  “dropped his act” several times while I was alone with him in
the holdover area of the Courtroom; and, in fact was able to assist me in
evaluating for possible objection photos of the crime scene (I had not seen the
interior, whereas Mr. Hill admitted that he had); and, chose this bizarre
behavior in Court in order to absent himself from the Courtroom, because he
could not face his family (especially his wife) now that he had admitted his
guilt.

C.  Trial
Court’s Order, Findings of Fact, and Conclusions of Law

The
trial court denied Hill’s motion for DNA testing and adopted the State’s second
proposed memorandum, findings of fact, and conclusions of law.  The trial court
made the following fact findings pertinent to this appeal:[9]

7.  Defendant admitted committing the offense to two
fellow inmates. 

8.  Defendant “made admissions to” his trial attorney,
Hon. Edwin Youngblood, “numerous times” that he “murdered” the victim.

. . . . 

12.  Prior to trial, Defendant called his biological
daughter, Quashunda, on the phone and asked her to tell his wife that “he had
bought the pregnancy test and the condoms” for her because “he didn’t want [her
stepmother] to know that he was having an affair.” 

13.  At trial, Defendant was caught red-handed sending a
note to “Evon, Kesha, [and] Mom[m]a” to hide Quashunda and not allow her to
testify.

14.  Defendant’s note included instructions to find
someone to “claim” the pregnancy test and to “say” that he was sexually
involved with them because “[o]therwise, [he was] in trouble.”

15.  Defendant malingered to appear incompetent and
suffering from drug ingestion.

16.  Defendant’s own attorney, Hon. Edwin Youngblood,
witnessed Defendant “drop his act” of incompetence several times while they
were alone in the holdover area of the courtroom.

17.  Defendant approached Hon. Youngblood to bribe Hon.
Gregory Miller, the prosecutor, and this Court to get the case dropped.

          . . . . 

19.  Surveillance cameras and electronic journals
established that Defendant was at the 100 Southeast Green Oaks Walgreens at
7:02 a.m. and the 3001 Matlock Road Kroger at 8:21 a.m. in Arlington, Texas.

20.  At the time of the murder, Defendant lived at 1311
Gilday Drive in Arlington, Texas. 

21.  The Walgreens is approximately four miles away, or
ten minutes, from Defendant’s home.

22.  Defendant would have to be gone about one half an
hour just to drive to Walgreens and make his purchase.

23.  Kroger is approximately 2.4 miles, or six minutes,
from Defendant’s home.

24.  Even with Defendant’s wife’s timeline[,] there [are]
thirty minutes unaccounted for.

25.  If Defendant went straight home after checking out
of Walgreens, he would have returned home around 7:15 a.m.; If he then left for
Kroger 30 minutes later, he would have arrived at Kroger around 7:50 a[.]m[.] and
not 8:21 a.m.

26.  This Court finds Defendant’s wife’s affidavit
suspect because it is a bit too specific regarding how much time Defendant
spent at home at 7 a.m. when she was admittedly just waking up on a date years
prior.

27.  Defendant confessed to fellow inmates D’juan Gipson
and John Denmore that he murdered the victim.

28.  Defendant admitted the murder to Hon. Edwin
Youngblood.

29.  Defendant’s confessions are corroborated by the fact
that Defendant asked his daughter to lie about why he bought the pregnancy test
and condoms two blocks from the victim’s home because he didn’t want her
stepmother to know about his affair.

30.  Defendant’s confessions are corroborated by the fact
that he tried to have his family hide his daughter, Quashunda, so she couldn’t
testify at trial.

31.  Defendant’s confessions are corroborated by the fact
that he wanted his family to have some female commit perjury by testifying that
she was in a sexual relationship with Defendant and that the pregnancy test was
for her.

32.  Defendant’s confessions are corroborated by the fact
that Jakeeta Taylor identified Defendant as the person she saw outside the
Walgreens around the time of the murder.

33.  Defendant’s confessions are corroborated by the
surveillance videos showing a man matching Defendant’s description was making
the purchase at Walgreens.

34.  Defendant’s confessions are corroborated by
Defendant’s debit card records and Walgreens electronic journals showing that
Defendant purchased condoms and a pregnancy test that morning.

35.  Defendant’s confessions are corroborated by the
victim’s caller ID showing that a call was made to her home from that Walgreens
around the time Defendant was making his purchase.

36.  The totality of the evidence demonstrates that
identity was not or is not at issue.

37.  The blood stain on the rocking chair cushion is in
the shape of a knife as if it was used to wipe the blood off the murder weapon
after the attack.

38.  The absence of Defendant’s DNA in the blood stain on
the rocking cushion would not prove his innocence because it is highly likely,
based on the facts, that the blood belongs to the victim and there is no
evidence, or allegation, that the perpetrator injured himself during the
attack.

39.  The DNA results from the rocking chair cushion for
epithelial cells would merely “muddy the waters” because there is no evidence
when the last time it was cleaned and there is a likelihood that the DNA of
other persons not involved in the offense would be present.

40.  The absence of Defendant’s DNA on the rocking chair
cushion would not prove his innocence because there is no evidence that the
perpetrator had cause to leave DNA on it.

41.  Defendant has failed to show that “there is a 51%
chance that” he would not have been convicted had exculpatory results been
obtained through DNA testing of the rocking chair cushion.

42.  The swab that tested positive for blood was taken
from the “inside of the front door, just to the lower left hand side of the
deadbolt lock.”

43.  The absence of Defendant’s DNA in the blood stain on
the door would not prove his innocence because it is highly likely, based on
the facts[] that the blood belongs to the victim and there is no evidence, or
allegation, that the perpetrator injured himself during the attack.

44.  The DNA results from the front door swab for
epithelial cells would merely “muddy the waters” because there is no evidence
when the last time it was cleaned and there is a likelihood that the DNA of
other persons not involved in the offense would be present.

45.  The absence of Defendant’s DNA on the front door
where swabbed would not prove his innocence because there is no evidence that
the perpetrator had cause to leave DNA on it.

46.  Defendant has failed to show that “there is a 51%
chance that” he would not have been convicted had exculpatory results been
obtained through DNA testing of the front door swabs.

47.  The payphone was outside the Walgreens where
Defendant purchased the condoms and pregnancy test.

48.  The absence of Defendant’s DNA on the payphone would
not prove that Defendant did not murder the victim because the payphone was not
involved in the actual commission of the offense.

49.  There is no evidence, or allegation, as to when the
payphone was cleaned prior to the swabbing.

50.  The payphone was used four times from the 6:55 a[.]m[.]
call to the victim’s home before Detective Nutt, the person who ordered the
phone be processed, was notified about the murder at approximately 2:30 p[.]m[.]
on March 15, 2005.

51.  The payphone was used to make thirteen calls on
March 14, 2005, two calls on March 13, 2005, and five calls on March 12, 2005.

52.  The DNA results from the payphone swabs would merely
“muddy the waters” because there is no evidence when the last time it was
cleaned and there is a high likelihood that the DNA of other persons not
involved in the offense would be present.

53.  Defendant has failed to show that “there is a 51%
chance that” he would not have been convicted had exculpatory results been
obtained through DNA testing of the payphone swabs.

54.  The hairs were found in the drain of the shower in
the bathroom located on the downstairs floor closest to the victim’s room.

55.  The absence of Defendant’s DNA in the hairs found in
the tub would not prove his innocence because there is no evidence that the hairs
belonged to the perpetrator.

56.  The DNA results from the hairs in the bathtub would
merely “muddy the waters” because there is no evidence as to how long the hairs
were in the tub drain or when the last time the tub was cleaned.

57.  Defendant has failed to show that “there is a 51%
chance that” he would not have been convicted had exculpatory results been
obtained through DNA testing of the hairs found in the bathtub.

The
trial court made the following pertinent conclusions of law:

4.  Based on the totality of the evidence, Defendant has
failed to demonstrate that identity was or is an issue in this case.

. . . .

9.  Defendant has failed to prove, by a preponderance of
the evidence, that he would not have been convicted had exculpatory results
been obtained through DNA testing of the rocking chair cushion.

10.  Defendant has failed to prove, by a preponderance of
the evidence, that he would not have been convicted had exculpatory results
been obtained through DNA testing of the front door swab.

11.  Defendant has failed to prove, by a preponderance of
the evidence, that he would not have been convicted had exculpatory results
been obtained through DNA testing of the payphone swabs.

12.  Defendant has failed to prove, by a preponderance of
the evidence, that he would not have been convicted had exculpatory results
been obtained through DNA testing of the hairs in the victim’s bathtub.

13.  Defendant has failed to show that “there is a 51%
chance that” he would not have been convicted had exculpatory results been
obtained through DNA testing.

14.  Defendant is unable to prove by a preponderance of
the evidence that he would not have been convicted had exculpatory results been
obtained through additional DNA testing.

III. 
DNA Testing

In his sole point, Hill complains that the
trial court erred by denying his motion for DNA testing because he met all of
article 64.03’s requirements.  Specifically, he contends that the items for
which he requested DNA testing could show that there is a greater than 50%
chance that he would not have been convicted because, based on the police
report, there were several other suspects for the murder; therefore, he argues:

·       
If
the murderer was injured during a struggle with the victim, the knife-shaped
blood stain on the cushion of the rocking chair and the front door blood stain
make it conceivable that this blood could match someone other than the victim
or Hill;

·       
If
the hairs from the bathtub do not match the victim, other members of her
household, or Hill, this would indicate the presence of an assailant other than
Hill; and

·       
If
the swabs from the payphone do not contain Hill’s DNA, then this would “be a
relevant piece of information.”

A.  Applicable
Law

To
be entitled to post-conviction DNA testing, a convicted person must meet the statutory
requirements of code of criminal procedure article 64.03; failure to satisfy
any of the requirements defeats the motion.  See Tex. Code Crim. Proc.
Ann. art. 64.03 (West 2006 & Supp. 2012); Routier v. State, 273
S.W.3d 241, 245–46 (Tex. Crim. App. 2008); Rivera v. State, 89 S.W.3d
55, 59 n.13, 61 (Tex. Crim. App. 2002); Dinkins v. State, 84 S.W.3d 639,
641–42 (Tex. Crim. App. 2002).  To satisfy article 64.03 here, Hill had to show
that identity was or is an issue in the case and that a reasonable probability
exists that he would not have been convicted if exculpatory DNA test results
had been obtained.[10]  See Tex. Code
Crim. Proc. Ann. art. 64.03(a); Rivera, 89 S.W.3d at 59 n.13.  When a
trial court denies a motion for post-conviction DNA testing without a hearing,
we review the ruling de novo.  Smith v. State, 165 S.W.3d 361, 363 (Tex.
Crim. App. 2005).

A
convicted person who pleaded guilty or nolo contendere or, whether before or
after conviction, made a confession or similar admission in the case may submit
a motion under chapter 64, and “the convicting court is prohibited from finding
that identity was not an issue in the case solely on the basis of that plea,
confession, or admission.”  Tex. Code Crim. Proc. Ann. art. 64.03(b)
(emphasis added); Bell v. State, No. 02-10-00557-CR, 2011 WL 3795239, at
*2 (Tex. App.—Fort Worth Aug. 25, 2011, pet. ref’d) (mem. op., not designated
for publication) (noting that although article 64.03(b) provides that the trial
court cannot find that identity was not an issue in the case solely on the
basis of a guilty plea, this does not mean that the trial court cannot consider
the plea along with the remainder of the record).

A
convicted person is not entitled to DNA testing when the testing would “merely
muddy the waters.”  Ex parte Gutierrez, 337 S.W.3d 883, 901 (Tex. Crim.
App. 2011).[11]  That is, the mere
presence of a third party’s DNA at a crime scene does not establish a
reasonable probability of an appellant’s innocence when it does not explain
away all of the other evidence pointing to his guilt.  White v. State,
No. 02-05-00041-CR, 2006 WL 59356, at *2 (Tex. App.—Fort Worth Jan. 12, 2006,
pet. ref’d) (mem. op., not designated for publication) (citing Skinner v.
State, 122 S.W.3d 808, 812 (Tex. Crim. App. 2003) (op. on reh’g)).  And even
if DNA test results could be exculpatory, they are considered in the context of
all other relevant evidence and must conclusively outweigh all other evidence
of the convicted party’s guilt.  Mejia v. State, No. 14-08-01047-CR,
2010 WL 2650021, at *3 (Tex. App.—Houston [14th Dist.] July 6, 2010, no pet.)
(mem. op., not designated for publication) (citing Wilson v. State, 184
S.W.3d 481, 485 (Tex. Crim. App. 2006), and Jacobs v. State, 115 S.W.3d
108, 113 (Tex. App.—Texarkana 2003, pet. ref’d)).

B. 
Analysis

Hill
argues that although he pleaded guilty, the evidence connecting him to the
murder “is purely circumstantial.”  The State responds that the trial court
found that identity was not and is not in issue based, in part, on Hill’s confessions
to Gipson, Densmore, and Youngblood, and based on corroboration by Hill’s debit
card records and the Walgreens electronic journals showing that Hill had been
at a Walgreens two blocks from the victim’s home.  Additionally, the State
responds, Jakeeta Taylor identified Hill as the man she saw at Braum’s, and the
trial court was entitled to disbelieve the affidavit provided by Hill’s wife
with regard to the events of the day of the murder.

Considering
this evidence, as well as the rest set out in extensive detail above in our
factual recitation, we agree with the State because here, there is no
indication that I.S.’s assailant was injured when neither blood nor tissue-like
material was detected in the fingernail cuttings taken from her corpse.  Therefore,
the blood stains on the rocker cushion and from the front door are more
probably from I.S., whom the deputy medical examiner testified bled to death,
instead of her assailant.  Further, the absence of Hill’s DNA and the presence
of third-party DNA in swabs from the public pay phone will not exonerate Hill
when several hours had passed before the police secured the pay phone.[12] 
And the absence of Hill’s DNA from the bathtub hairs would not exonerate Hill
in light of the substantial other evidence corroborating his conviction and
supporting the denial of his motion for DNA testing, as set out above. 
Therefore, we overrule Hill’s sole point because testing any of the four items
for which he requested DNA testing would solely “muddy the waters.”  See
Gutierrez, 337 S.W.3d at 901; see also White, 2006 WL 59356,
at *2–3 (affirming the denial of appellant’s motion for DNA testing when even
though testing of swabs of the sexual assault complainant’s mouth might provide
evidence of another man’s DNA, it did not explain away the other evidence of
appellant’s guilt).

IV.
 Conclusion

Having overruled Hill’s sole point, we affirm
the trial court’s judgment.

 

 

 

PER CURIAM

 

PANEL: 
MCCOY,
DAUPHINOT, and WALKER, JJ.

 

DO
NOT PUBLISH

Tex.
R. App. P. 47.2(b)

 

DELIVERED:  September 13,
2012

 



 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00398-CR

 

 









 
 
 Ronald
 Michael Hill
  
  
  
 v.
  
  
  
 The
 State of Texas
 
 
 §
  
 §
  
 §
  
 §
  
 §
 
 
 From the 396th District
 Court
  
 of
 Tarrant County (0973203D)
  
 September
 13, 2012
  
 Per
 Curiam
  
 (nfp)
 
 


 

JUDGMENT

 

          This
court has considered the record on appeal in this case and holds that there was
no error in the trial court’s judgment.  It is ordered that the judgment of the
trial court is affirmed. 

 

SECOND DISTRICT COURT OF APPEALS 








 

 

 

PER
CURIAM

 

 









[1]See Tex. R. App. P. 47.4.





[2]Detective Nutt testified
that SBC was unable to provide police with any records pertaining to the pay
phone because that particular phone did not track outgoing calls.  However,
evidence attached to the State’s reply to Hill’s motion shows that these
records were obtained, and they reflect that calls were made on March 15 at
10:48 a.m., 11:42 a.m., 1:10 p.m., 3:12 p.m., and 7:33 p.m.





[3]Hill’s house was in
Arlington, but only a mile from the Kroger.





[4]At trial, Detective Nutt
acknowledged that telling Hill that I.S. had been pregnant was a deception
because I.S. had not actually been pregnant.  However, police found references
in I.S.’s notebooks mentioning that I.S. believed that she was pregnant.





[5]Gipson was serving a twenty-five
year sentence for evidence tampering when he met Hill in jail; he also had two
prior felony convictions for aggravated assault with a deadly weapon and injury
to a child.





[6]Dr. Krouse opined that the
blood stain on the rocking chair cushion was a blood deposit from an object
that was a knife blade or something very similar.





[7]When asked about whether
Hill had described “the car” to him, Gipson said, “He told me it was a Dodge
Intrepid, something like that.”  However, it is unclear whether Gipson understood
the question with reference to the murder or with regard to Hill’s comment
about having intercourse with I.S. in his wife’s car.





[8]The sealed record supports
the trial court’s fact finding number 17, set out below.





[9]The trial court also found
that evidence exists in a condition making DNA testing possible and that might
contain biological material and found that all four items requested by Hill
were available for DNA testing.





[10]Neither party argues
about article 64.03’s other requirements.  See Tex. Code Crim. Proc.
Ann. art. 64.03(a).





[11]In Gutierrez, the
court of criminal appeals held that the trial court did not err by denying DNA
testing when a third-party match to the biological evidence would not have
overcome the overwhelming evidence of appellant’s direct involvement in a
multi-assailant murder.  337 S.W.3d at 901–02.  And in contrast to
single-assailant sexual assault cases, none of the evidence that Hill seeks to
have tested would establish his innocence.  Cf. Esparza v. State, 282
S.W.3d 913, 922 (Tex. Crim. App. 2009); Blacklock v. State, 235 S.W.3d
231, 232–33 (Tex. Crim. App. 2007).





[12]Also, in light of the
discrepancy between the pay phone’s records and Detective Nutt’s testimony,
there appears to be a question as to whether that particular pay phone was used
to call the victim’s house.  However, this discrepancy in the pay phone’s use
makes it even less likely that the absence of Hill’s DNA would be exculpatory.