

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00398-CR

RONALD MICHAEL HILL                                   APPELLANT

V.

THE STATE OF TEXAS                                         STATE

----------

FROM THE 396TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. Introduction

In one point, Appellant Ronald Michael Hill appeals the trial court's denial of his motion for DNA testing.  We affirm.

### II. Factual and Procedural Background

After Hill pleaded guilty to the murder of fifteen-year-old I.S., who bled to death in her family's living room on March 15, 2005, a jury convicted him and

----------

[1]*See* Tex. R. App. P. 47.4.

assessed his punishment at life imprisonment, and the trial court sentenced him accordingly. On appeal, Hill challenged his competency to stand trial and the voluntariness of his absence during trial, and we affirmed his conviction. *See Hill v. State*, No. 02-06-00094-CR, 2007 WL 866476, at *1, 7–9 (Tex. App.—Fort Worth Mar. 22, 2007, pet. ref'd) (mem. op., not designated for publication), *cert. denied*, 552 U.S. 1202 (2008).

## A. Hill's Motion for DNA Testing

In 2009, Hill filed a motion requesting DNA testing of the following items collected after the murder: (1) a swab of a knife-shaped blood stain on the cushion of a rocking chair at the victim's house; (2) a swab of a blood stain from the victim's front door; (3) swabs from a pay phone; and (4) hairs from a bathtub in the victim's house.

To his motion, Hill attached the Arlington Police Department case report, which included several reports by police officers made over the course of the investigation. He also included his July 14, 2010 affidavit and his wife's August 10, 2010 affidavit. The trial court granted Hill's motion to take judicial notice of all filings in his case, the reporter's record of his trial, and any and all exhibits admitted at his trial.

### 1. Police Investigation Records and Trial Record

I.S.'s parents left the house for work before 6 a.m. on March 15, 2005. I.S., who was a high school student, was on spring break. According to the police investigation records and testimony at trial by Arlington Police Detective

2

Richard Nutt, I.S.'s home phone showed that a call had come from a pay phone with number 817-465-9750 at 6:55 a.m. on March 15. Detective Nutt located the pay phone bearing that number at a Walgreens within walking distance—a block to two blocks—from I.S.'s home.[2] Arlington Police crime scene investigator Ignacio Acosta testified that he processed the pay phone's receiver for fingerprints but that he was unable to obtain any quality latent prints from it.

The Walgreens March 15, 2005 sales transaction records from between 6:30 a.m. and 7:30 a.m. revealed a transaction for the purchase of condoms and a pregnancy test at 7:02 a.m. with a debit card. The store's video surveillance of that transaction showed a black male wearing dark clothing and a cap.

Police traced the debit card used at the Walgreens to Hill, and his card account records showed the purchase at Walgreens at 7:02 a.m., followed by a purchase of gas at a Kroger in Mansfield, around five miles away, at 8:21 a.m.[3] The account records also showed a purchase at a nearby Lowe's in Arlington at 9:56 a.m., and Detective Nutt testified that the police recovered the Lowe's surveillance videotape, which showed that Hill had completely changed his

---

[2]Detective Nutt testified that SBC was unable to provide police with any records pertaining to the pay phone because that particular phone did not track outgoing calls. However, evidence attached to the State's reply to Hill's motion shows that these records were obtained, and they reflect that calls were made on March 15 at 10:48 a.m., 11:42 a.m., 1:10 p.m., 3:12 p.m., and 7:33 p.m.

[3]Hill's house was in Arlington, but only a mile from the Kroger.

clothing from what he had worn earlier at Walgreens. The account records also show a charge for Dave & Buster's in Dallas at 1:13 p.m.

When I.S.'s father found I.S.'s body around 2 p.m., she was lying on the floor with a pillow on her face. Dr. Marc Krouse, the deputy chief medical examiner who performed I.S.'s autopsy on March 16, stated that I.S. had a cluster of superficial stab wounds on the upper part of her neck and then three deeper cuts, one of which was lethal, on the lower front of her neck. Dr. Krouse determined that the resulting blood loss from I.S.'s partially cut internal jugular vein is what killed her, and he ruled her cause of death a homicide.

Hill and I.S. were both members of Quest Personals, a telephone chat line, and Quest and SBC both confirmed that Hill's home phone number was 817-375-1767. SBC also provided I.S.'s home phone records, which showed that between March 7 and March 15, I.S.'s home received over thirty calls from 817-375-1767, ranging in length from only a few seconds to over an hour. I.S.'s parents testified that they did not know anyone with the phone number 817-375-1767.

Hill had a white, two-door 1995 Lincoln Mark VIII and a maroon 2001 Dodge Intrepid. Jakeeta Taylor, the manager of a Braum's located across the street from the Walgreens near I.S.'s home, told police that she saw a white, two-door vehicle parked on the north side of the Braum's parking lot and saw a black male, who was wearing a cap, pacing in the parking lot; she also saw him walk north along Matlock. She identified Hill from a photo lineup as the man she saw.

4

When police interviewed Hill on April 1, 2005, he confirmed that he worked a midnight shift (11 p.m. to 7 a.m.) and that he was married and had three children at home and a fifteen-year-old daughter, Quashunda, who did not live with him. Hill acknowledged using Quest but he denied knowing I.S. or having had a relationship with her. When asked about the calls from his phone number to I.S.'s home, Hill could not account for them. Hill first told police that after he left work on Tuesday, March 15, at 7 a.m., he went straight home and did not stop anywhere. At Hill's trial, Detective Nutt testified that by the time of the interview, police had already verified with Hill's employer that Hill had not gone to his 11 p.m.-to-7 a.m. shift on March 14, 2005.

When police informed Hill about the video from Walgreens that showed him making a purchase on March 15, Hill said he had forgotten about that and said that he woke up and did not feel well, so he went to Walgreens and bought some cold medicine. Then, when informed that the police had obtained the register tape and had seen that he had bought condoms and a pregnancy test, Hill admitted that he had bought those items and said that he had purchased them for a girlfriend that he had "on the side." He asked police not to tell his wife about the affair. Hill refused to give police the name of his girlfriend, saying that it was "confidential."

When police told Hill that a video of him at Lowe's had been obtained and showed that he had changed clothes, Hill was unable to explain why he had

5

changed clothes. When they told Hill that I.S. had been pregnant[4] and that they had a warrant for Hill's DNA, Hill told them to take his DNA and compare it because he did not know I.S. so there was no way he could be the donor.

Police investigation records state that three days after Hill's interview, his wife Sharnise told police that she had visited Hill in jail and that he told her that he had purchased the condoms and pregnancy test for his daughter Quashunda. Sharnise asked them to interview Quashunda.

Quashunda's mother, Sharonda, told police that Hill had called her and told her that police were accusing him of killing a fifteen-year-old girl and that he had nothing to do with it. Hill spoke with Quashunda, who told Sharonda and the police that Hill asked her to lie to Sharnise and the police and say that Hill had purchased some condoms and a pregnancy test for her. At Hill's trial, Quashunda testified that Hill called her on April 3, 2005, and asked her to tell Sharnise that he had bought the pregnancy test and condoms for her because he did not want Sharnise to know that he was having an affair. Prior to Quashunda's testimony at his trial, Hill attempted to show to some of his family members the following note, which was admitted in evidence and published to the jury:

---

[4]At trial, Detective Nutt acknowledged that telling Hill that I.S. had been pregnant was a deception because I.S. had not actually been pregnant. However, police found references in I.S.'s notebooks mentioning that I.S. believed that she was pregnant.

Evon, Kesha, Momma, y'all have to go and get Quashunda. They want her to take the stand. She can't be allowed to do that. You'll need to get her and take her to Grandma's house until the trial is over. She cannot testify at all. And I will have to have someone to claim the pregnancy test, someone to say I was sexually involved with them during the month of February and they thought they was pregnant because they missed the cycle. It was a one-time deal and nothing else. The case goes away with that, and one person who could be used is Visa or Christie. Otherwise, I'm in trouble.

*Hill*, 2007 WL 866476, at *1.

Detective Nutt interviewed inmate D'Juan Gipson on April 27, 2005.[5] At Hill's trial, Gipson testified that in April 2005, while they were in jail together, Hill told him that he had killed I.S., and Gipson described their conversation:

[Hill] said he met her like March the 2nd on a Quest chat line and that they talked for a few days and they hooked up. He said they had sex inside his wife's car.

. . . .

He told me that on the day that he killed her, that he went to Walgreen [sic], bought some condoms and a pregnancy test. He said that he went to her house and knocked on the door. He didn't knock—with his finger rung the doorbell, knocked on the door with his finger. That she came to the door and that he asked was she going to let him in. So she let him in.

So he was telling her that, he said, you can't be pregnant, she's like, yeah, I'm pregnant. So he said that he got a wife and four kids and this can't be happening.

. . . .

And that, well, she let him in. He was telling her that he had a wife and four kids, she couldn't be pregnant. So she said that, yeah,

_____

[5]Gipson was serving a twenty-five year sentence for evidence tampering when he met Hill in jail; he also had two prior felony convictions for aggravated assault with a deadly weapon and injury to a child.

I'm pregnant, and she needed $500 and a cell phone. He was like, why you need $500, a cell phone? She said because her parents had took her phone because of a bill or something. He was like, man, I can't give you $500 and a cell phone.

So he said that she was sitting in the chair, he got behind her and he started—he was showing me like he got behind her, put her in a head lock and he was choking her until she passed out. So he said he laid her on the ground. He felt her pulse and the pulse was still beating, so he went to the kitchen and got a knife, and he came in and cut her throat.[6]

After he cut her throat, he said that he went back and got the trash can—a trash bag out of the kitchen and put all the stuff inside the trash bag. He said he walked to the front door to make sure there wasn't nobody outside. He looked, wasn't nobody outside, he walked across the grass and he walked back to his car that he had parked behind a Braum's or something.[7]

. . . .

After he got—put the stuff inside the trash bag, he said he was walking back to the car, and before he got inside the car, he looked and he had blood on his sleeve, so he turned his shirt inside out and got in the car. He said that he put the trash bag on the console of the car. He drove home. He changed clothes in the garage.

After he changed clothes, he got his son. They supposed to be going fishing that day with his father, something, the plans got cancelled. He said after he drove around Dallas, he say—he had a baseball cap on backwards. He said he had a dark one, a dark-colored baseball cap or something, he threw it over in Dallas and the clothes he threw in the trash can and he drove around.

. . . .

---

[6]Dr. Krouse opined that the blood stain on the rocking chair cushion was a blood deposit from an object that was a knife blade or something very similar.

[7]When asked about whether Hill had described "the car" to him, Gipson said, "He told me it was a Dodge Intrepid, something like that." However, it is unclear whether Gipson understood the question with reference to the murder or with regard to Hill's comment about having intercourse with I.S. in his wife's car.

8

He told me she was 15 years old.  At first he told me that she told him that she was a senior at UTA.  And then he came and told me that he found out she was 15 years old.

Gipson then described a conversation that he had with his girlfriend about Hill:

I didn't give her any details about what he told me, but I told her that he trying—at first he was trying to get me to find somebody that I can say the rubbers and pregnan[cy] test was for.  I was like, man, I don't know, I'm in enough trouble now, I don't know.

So I told her, I said, man, this dude want[s] me to find—see can I get a girl to say the rubber and the condoms and the pregnan[cy] test was for, she's like, no, I don't want nothing to do with that.  So that's when I had her contact the Arlington Police Department.

Gipson's original plea offer of forty years was reduced to twenty-five years in exchange for his testimony.

Gipson also testified that Hill told him that the trash bag he stole from I.S.'s kitchen was a black trash bag.  I.S.'s mother testified that she had changed out the black kitchen garbage bag the night before the murder for a fresh one and that it was there when she left for work.  I.S.'s father said that he had not removed it.

John Densmore, another inmate, testified that he and Hill shared a cell in April 2005, and that Hill told him the following:

He told me that he had called her and made plans to go to her house, that he had went by Walgreens on the corner of Matlock and Green Oaks and purchased a pregnancy test, some condoms, and went to her house.

9

And when he got to her house, she took the pregnancy test and it turned up positive, and they argued amongst each other about whether or not she would have an abortion so that her having the baby wouldn't affect the fact that he was married and his raising of his family, his kids and having a happy family. And she said that she was not going to have an abortion and if she was pregnant, she was going to have the baby.

And they argued and argued, and that he left the house, went to Matlock and Bardin to an EZ Mart convenience store to purchase gas for his car, but his credit card wouldn't work at the pump. So he left, went back toward her house, stopped at what was an Eckerds— what used to be an Eckerds between the Jack in the Box and Braum's at Matlock and Green Oaks, walked around the parking lot for a little while just thinking to himself how he could convince her to have an abortion.

He said that someone from the Braum's come out and questioned him if he was all right, if he needed help or anything. He told them he was fine. He walked back to her house, and they argued some more and that she wouldn't relent on the fact that she was going to have the child if she was pregnant.

And he had gotten a knife out of the kitchen, cut her throat, left her in the living room floor, put a pillow over her body so that whoever come in the house wouldn't immediately know, I guess, that she was deceased, walked out of the house, went back to his car, went to his house, said he woke his two sons up because they were going to go to some kind of outing or something. I don't remember, I don't recall what the outing was. Left from his house, went to Matlock and Mansfield Webb Road to a Kroger and got some gasoline and went back to pick his kids up, and I guess they went and did whatever.

Densmore said that he was familiar with the neighborhood where everything happened because his mother lived near there. He also said that when Hill learned that Densmore's mother was a Walgreens employee, he asked Densmore to ask his mother if she could view the videotape footage of him in the store, and if so, whether she could get a copy of it for him and his wife.

10

Densmore said that he asked his mother, and his mother told him that she could not. Densmore and Gipson were friends and talked about what each had heard from Hill in October 2005, but Densmore said that Gipson had not asked him to back up his story and that he did not know that Gipson had made a deal in exchange for his testimony.

The police investigation records also reflected that police searched I.S.'s room and found several men's names and phone numbers, which they checked, as well as information on an open sexual assault investigation involving I.S., who was reported to have engaged in consensual sex with adult males that she met on telephone chat lines.

The investigation records also reflected that on March 16, 2005, at around 6:45 a.m., Kenneth J. Randolph, a black male, drove up to the crime scene and spoke with an officer. Randolph told the officer that he was a family friend and knew I.S. and that he had talked to I.S. about talking to people on chat lines and told her that anyone could just come right in her house and kill her and no one would know. Randolph said that he had come to the house the day before when he found out that I.S. was dead and told his friends who were there with him that the perpetrator could be standing among them and the police would not know it because the police were portrayed on television as being very stupid. Randolph kept his right hand in his pants pocket and appeared to be playing with his genitals while he talked with the officer and looked at I.S.'s house. Randolph

11

said he could not go to work that morning because he had been up all night thinking about I.S.'s death and that he was too upset.

A code enforcement officer told police that the fence was down between I.S.'s street and Cornfield Street, and that he had knocked on I.S.'s door at around 12:50 p.m. on March 15, but no one had answered. A neighborhood mail carrier told police that around 1:45 p.m. on March 15, he saw two teenage males walking west on Cornfield, but when they saw him, they quickly turned around and walked back the way they had come.

In addition to other evidence collected, police submitted right and left fingernail cuttings from I.S. to a DNA laboratory, but neither blood nor tissue-like material were detected from these. Neither spermatozoa nor acid phosphatase, which is suggestive of semen, were detected from I.S.'s vaginal, oral, or anal specimens; acid phosphatase was also not detected on the perineal swabs or I.S.'s underwear. No analysis was conducted on the swabs from the pay phone. Presumptive tests for blood were positive for the cushion from the rocking chair and the front door swab.

## 2. Hill's Affidavit

In his July 14, 2010 affidavit, Hill averred that he did not murder I.S. and stated the following:

> On March 15, 2005 I awoke around 6:30 a[.]m[.] and put my clothes that I had on the day before on, that was on the left side of the bed. I spoke briefly to my wife as she asked me why I always gets [sic] up early. I left to go to Walgreens in my Dodge Intrepid that is used as my wife['s] car. I went to Walgreens and made a purchase for a

pregnancy test and condoms then I left coming back home. I was gone for about 20–30 minutes when I arrived at home and I beg[an] talking to my wife about why she always keep the car on E fuel level. Then I asked her what she wanted to do today with the kids. Then I asked my wife for her Kroger discount gas card. I then left the room and walked to my sons['] room. [J.H.] and [D.H.] were up watching cartoon network. I beg[a]n talking to them then we started wrestling with each other. After we played for about 10–15 minutes I asked them what they wanted to do today. [D.H.] said fishing, then I asked [J.H.] and he said he didn't care. I told them to make their beds and straighten their room and get dressed. I left went to Krogers to get some gas for 10–15 minutes, then I came right back home. When I got back home I changed into what I was going to wear for the day, then me and my sons left to go to my dad[']s house to go fishing. We left in the Dodge Intrepid and stopped on Camp Wisdom and Cedar Hill State Rd to a spot people usually fish at to see if the fish was bitting [sic]. A police officer pulled behind us and told us that was private property and we couldn't go there. We spoke for about 5–10 minutes then we left to go get my [d]ad in Dallas on Kiest and Ledbetter. We got there about 9:00 or a little before. My dad said he changed his mind to go fishing because it was cold and his hands w[ere] hurting. I told him to tell the boys and he promised next week. We talked for a little bit then we left. We came back to Arlington but stopped at Loews [sic] to get some weed killer for the grass. After we left Loews [sic] we came back home to find my wife and daughter getting dressed. She asked what happened and I told her my dad changed his mind and I asked her what she wanted to do. She wasn't sure so I said lets go and we'll figure it out on the way. So we spoke about the Imax movie we wanted to see called under water creatures in 3-D. We drove to Cinemark Imax in Dallas on 635 LBJ and Josey Lane to the theater. We got there around noon but the movie didn't start for a couple of hours. Then my wife said she was hungry so we went to David [sic] Busters. We all ordered lunch and ate then we played games. We got there about 12:30 or so and stayed there until about 4:00 p[.]m. We left and came back to Arlington and made it ho[m]e about 5:00 p[.]m[.] and went in the living room to watch T.V. Thats when we saw breaking news on T.V. about a death in Arlington and the young girl on the news went to Timberview High school. Then the kids asked could they go outside and I said yes but be back before dark. That[']s what was done on March 15, 2005. I did not commit the murder of [I.S.], nor was I ever at her home or ever met her personally.

13

## 3. Sharnise's Affidavit

In her August 10, 2010 affidavit, Sharnise set out the following facts:

On March 15, 2005[,] my husband, Ronald Hill woke up at about 6:00–6:30 A.M. or so.  I remember him getting out of bed as I asked why he always got up early.  We spoke briefly, then he put his clothes on and left the house to go to the store.  He came back home shortly and we talked about our plans for the day with the kids.  He then asked me for my Kroger card and why I always kept the car on empty.  After 30 minutes, he left saying he was going to get gas.  He came back in about 15 minutes or so.

He told me he and the boys were going to go fishing with his dad and he and the boys left together.  I started cleaning up, got dressed and combed my hair.  They all returned a few hours later and said Ronald's dad changed his mind about fishing that day.

Ronald asked me what I wanted to do that day.  I wasn't sure so he said let's go and will figure it out on the way.  As we were in the car we talked about the IMAX Theater for a movie we wanted to see in 3-D.  We drove to Cinemark in Dallas off of 635 LBJ & Josey Lane or Webb Chapel to Cinemark IMAX Theater.  It was around 12 noon when we got there but the movie didn't start for a couple of hours.  I mentioned I was hungry and we ended up at Dave & Buster's.  We arrived and ordered lunch and played video games.  We were there for several hours and left around 4 p.m.

We headed back home to Arlington.  When we arrived home we went into the living room.  We sat on the couch to watch TV.  On the news, we saw a story about the death of a girl in Arlington.  The whole family was in the living room watching the news.  The news mentioned the deceased girl attended Timberview.

The kids asked if they could go outside.  Ronald told them to make sure to be in the house before dark.  They went outside and we continued watching TV.

Ronald's attorney, Edwin J. Youngblood, never asked me about my knowledge of Ronnie's activities on the day in question.  I would've been willing to tell him and to testify in court.  I even asked about a private investigator to help get answers but the attorney Mr. Youngblood said the District Attorney had already done an

14

investigation and there was no need. If asked by Edwin Youngblood I would've testified to the facts. I didn't attend the last day of Ronald's trial due to threats by the victim's family but would've testified on Ronald's behalf if called as a witness to these events.

## B. State's Response to Hill's Motion

In its response to Hill's motion, the State argued that identity was not and is not an issue in the case and that DNA testing would not exonerate Hill but rather just "muddy the waters." Among other things, to its response the State attached the affidavit of Edwin J. Youngblood, Hill's former trial counsel, which Youngblood filed in response to Hill's application for writ of habeas corpus alleging ineffective assistance of counsel, and the sealed record of the hearing on Youngblood's motion to withdraw prior to Hill's trial.[8]

Youngblood incorporated his letter to Hill into his affidavit, stating that if Hill had not passed a note seeking to hide a witness and to create perjured testimony, he probably would have been found not guilty and noting that Hill had made numerous admissions to him that he had murdered I.S. Youngblood also revealed the following in his affidavit:

> Had the Court conducted a formal hearing as to my client's competence to stand trial, and had I been compelled to testify as to my opinion, I would have testified that Mr. Hill was competent in my opinion. If further forced to explain my opinion, I would have testified that Mr. Hill: "dropped his act" several times while I was alone with him in the holdover area of the Courtroom; and, in fact was able to assist me in evaluating for possible objection photos of the crime scene (I had not seen the interior, whereas Mr. Hill admitted that he

---

[8]The sealed record supports the trial court's fact finding number 17, set out below.

15

had); and, chose this bizarre behavior in Court in order to absent himself from the Courtroom, because he could not face his family (especially his wife) now that he had admitted his guilt.

## C. Trial Court's Order, Findings of Fact, and Conclusions of Law

The trial court denied Hill's motion for DNA testing and adopted the State's second proposed memorandum, findings of fact, and conclusions of law. The trial court made the following fact findings pertinent to this appeal:[9]

7. Defendant admitted committing the offense to two fellow inmates.

8. Defendant "made admissions to" his trial attorney, Hon. Edwin Youngblood, "numerous times" that he "murdered" the victim.

. . . .

12. Prior to trial, Defendant called his biological daughter, Quashunda, on the phone and asked her to tell his wife that "he had bought the pregnancy test and the condoms" for her because "he didn't want [her stepmother] to know that he was having an affair."

13. At trial, Defendant was caught red-handed sending a note to "Evon, Kesha, [and] Mom[m]a" to hide Quashunda and not allow her to testify.

14. Defendant's note included instructions to find someone to "claim" the pregnancy test and to "say" that he was sexually involved with them because "[o]therwise, [he was] in trouble."

15. Defendant malingered to appear incompetent and suffering from drug ingestion.

16. Defendant's own attorney, Hon. Edwin Youngblood, witnessed Defendant "drop his act" of incompetence several times while they were alone in the holdover area of the courtroom.

---

[9]The trial court also found that evidence exists in a condition making DNA testing possible and that might contain biological material and found that all four items requested by Hill were available for DNA testing.

16

17. Defendant approached Hon. Youngblood to bribe Hon. Gregory Miller, the prosecutor, and this Court to get the case dropped.

. . . .

19. Surveillance cameras and electronic journals established that Defendant was at the 100 Southeast Green Oaks Walgreens at 7:02 a.m. and the 3001 Matlock Road Kroger at 8:21 a.m. in Arlington, Texas.

20. At the time of the murder, Defendant lived at 1311 Gilday Drive in Arlington, Texas.

21. The Walgreens is approximately four miles away, or ten minutes, from Defendant's home.

22. Defendant would have to be gone about one half an hour just to drive to Walgreens and make his purchase.

23. Kroger is approximately 2.4 miles, or six minutes, from Defendant's home.

24. Even with Defendant's wife's timeline[,] there [are] thirty minutes unaccounted for.

25. If Defendant went straight home after checking out of Walgreens, he would have returned home around 7:15 a.m.; If he then left for Kroger 30 minutes later, he would have arrived at Kroger around 7:50 a[.]m[.] and not 8:21 a.m.

26. This Court finds Defendant's wife's affidavit suspect because it is a bit too specific regarding how much time Defendant spent at home at 7 a.m. when she was admittedly just waking up on a date years prior.

27. Defendant confessed to fellow inmates D'juan Gipson and John Denmore that he murdered the victim.

28. Defendant admitted the murder to Hon. Edwin Youngblood.

29. Defendant's confessions are corroborated by the fact that Defendant asked his daughter to lie about why he bought the pregnancy test and condoms two blocks from the victim's home because he didn't want her stepmother to know about his affair.

17

30.    Defendant's confessions are corroborated by the fact that he tried to have his family hide his daughter, Quashunda, so she couldn't testify at trial.

31.    Defendant's confessions are corroborated by the fact that he wanted his family to have some female commit perjury by testifying that she was in a sexual relationship with Defendant and that the pregnancy test was for her.

32.    Defendant's confessions are corroborated by the fact that Jakeeta Taylor identified Defendant as the person she saw outside the Walgreens around the time of the murder.

33.    Defendant's confessions are corroborated by the surveillance videos showing a man matching Defendant's description was making the purchase at Walgreens.

34.    Defendant's confessions are corroborated by Defendant's debit card records and Walgreens electronic journals showing that Defendant purchased condoms and a pregnancy test that morning.

35.    Defendant's confessions are corroborated by the victim's caller ID showing that a call was made to her home from that Walgreens around the time Defendant was making his purchase.

36.    The totality of the evidence demonstrates that identity was not or is not at issue.

37.    The blood stain on the rocking chair cushion is in the shape of a knife as if it was used to wipe the blood off the murder weapon after the attack.

38.    The absence of Defendant's DNA in the blood stain on the rocking cushion would not prove his innocence because it is highly likely, based on the facts, that the blood belongs to the victim and there is no evidence, or allegation, that the perpetrator injured himself during the attack.

39.    The DNA results from the rocking chair cushion for epithelial cells would merely "muddy the waters" because there is no evidence when the last time it was cleaned and there is a likelihood that the DNA of other persons not involved in the offense would be present.

40. The absence of Defendant's DNA on the rocking chair cushion would not prove his innocence because there is no evidence that the perpetrator had cause to leave DNA on it.

41. Defendant has failed to show that "there is a 51% chance that" he would not have been convicted had exculpatory results been obtained through DNA testing of the rocking chair cushion.

42. The swab that tested positive for blood was taken from the "inside of the front door, just to the lower left hand side of the deadbolt lock."

43. The absence of Defendant's DNA in the blood stain on the door would not prove his innocence because it is highly likely, based on the facts[] that the blood belongs to the victim and there is no evidence, or allegation, that the perpetrator injured himself during the attack.

44. The DNA results from the front door swab for epithelial cells would merely "muddy the waters" because there is no evidence when the last time it was cleaned and there is a likelihood that the DNA of other persons not involved in the offense would be present.

45. The absence of Defendant's DNA on the front door where swabbed would not prove his innocence because there is no evidence that the perpetrator had cause to leave DNA on it.

46. Defendant has failed to show that "there is a 51% chance that" he would not have been convicted had exculpatory results been obtained through DNA testing of the front door swabs.

47. The payphone was outside the Walgreens where Defendant purchased the condoms and pregnancy test.

48. The absence of Defendant's DNA on the payphone would not prove that Defendant did not murder the victim because the payphone was not involved in the actual commission of the offense.

49. There is no evidence, or allegation, as to when the payphone was cleaned prior to the swabbing.

50. The payphone was used four times from the 6:55 a[.]m[.] call to the victim's home before Detective Nutt, the person who ordered the

phone be processed, was notified about the murder at approximately 2:30 p[.]m[.] on March 15, 2005.

51. The payphone was used to make thirteen calls on March 14, 2005, two calls on March 13, 2005, and five calls on March 12, 2005.

52. The DNA results from the payphone swabs would merely "muddy the waters" because there is no evidence when the last time it was cleaned and there is a high likelihood that the DNA of other persons not involved in the offense would be present.

53. Defendant has failed to show that "there is a 51% chance that" he would not have been convicted had exculpatory results been obtained through DNA testing of the payphone swabs.

54. The hairs were found in the drain of the shower in the bathroom located on the downstairs floor closest to the victim's room.

55. The absence of Defendant's DNA in the hairs found in the tub would not prove his innocence because there is no evidence that the hairs belonged to the perpetrator.

56. The DNA results from the hairs in the bathtub would merely "muddy the waters" because there is no evidence as to how long the hairs were in the tub drain or when the last time the tub was cleaned.

57. Defendant has failed to show that "there is a 51% chance that" he would not have been convicted had exculpatory results been obtained through DNA testing of the hairs found in the bathtub.

The trial court made the following pertinent conclusions of law:

4. Based on the totality of the evidence, Defendant has failed to demonstrate that identity was or is an issue in this case.

. . . .

9. Defendant has failed to prove, by a preponderance of the evidence, that he would not have been convicted had exculpatory results been obtained through DNA testing of the rocking chair cushion.

20

10. Defendant has failed to prove, by a preponderance of the evidence, that he would not have been convicted had exculpatory results been obtained through DNA testing of the front door swab.

11. Defendant has failed to prove, by a preponderance of the evidence, that he would not have been convicted had exculpatory results been obtained through DNA testing of the payphone swabs.

12. Defendant has failed to prove, by a preponderance of the evidence, that he would not have been convicted had exculpatory results been obtained through DNA testing of the hairs in the victim's bathtub.

13. Defendant has failed to show that "there is a 51% chance that" he would not have been convicted had exculpatory results been obtained through DNA testing.

14. Defendant is unable to prove by a preponderance of the evidence that he would not have been convicted had exculpatory results been obtained through additional DNA testing.

### III. DNA Testing

In his sole point, Hill complains that the trial court erred by denying his motion for DNA testing because he met all of article 64.03's requirements. Specifically, he contends that the items for which he requested DNA testing could show that there is a greater than 50% chance that he would not have been convicted because, based on the police report, there were several other suspects for the murder; therefore, he argues:

- If the murderer was injured during a struggle with the victim, the knife-shaped blood stain on the cushion of the rocking chair and the front door blood stain make it conceivable that this blood could match someone other than the victim or Hill;

- If the hairs from the bathtub do not match the victim, other members of her household, or Hill, this would indicate the presence of an assailant other than Hill; and

21

- If the swabs from the payphone do not contain Hill's DNA, then this would "be a relevant piece of information."

## A. Applicable Law

To be entitled to post-conviction DNA testing, a convicted person must meet the statutory requirements of code of criminal procedure article 64.03; failure to satisfy any of the requirements defeats the motion. *See* Tex. Code Crim. Proc. Ann. art. 64.03 (West 2006 & Supp. 2012); *Routier v. State*, 273 S.W.3d 241, 245–46 (Tex. Crim. App. 2008); *Rivera v. State*, 89 S.W.3d 55, 59 n.13, 61 (Tex. Crim. App. 2002); *Dinkins v. State*, 84 S.W.3d 639, 641–42 (Tex. Crim. App. 2002). To satisfy article 64.03 here, Hill had to show that identity was or is an issue in the case and that a reasonable probability exists that he would not have been convicted if exculpatory DNA test results had been obtained.[10] *See* Tex. Code Crim. Proc. Ann. art. 64.03(a); *Rivera*, 89 S.W.3d at 59 n.13. When a trial court denies a motion for post-conviction DNA testing without a hearing, we review the ruling de novo. *Smith v. State*, 165 S.W.3d 361, 363 (Tex. Crim. App. 2005).

A convicted person who pleaded guilty or nolo contendere or, whether before or after conviction, made a confession or similar admission in the case may submit a motion under chapter 64, and "the convicting court is prohibited from finding that identity was not an issue in the case *solely on the basis of that*

---

[10]Neither party argues about article 64.03's other requirements. *See* Tex. Code Crim. Proc. Ann. art. 64.03(a).

22

*plea, confession, or admission*." Tex. Code Crim. Proc. Ann. art. 64.03(b) (emphasis added); *Bell v. State*, No. 02-10-00557-CR, 2011 WL 3795239, at *2 (Tex. App.—Fort Worth Aug. 25, 2011, pet. ref'd) (mem. op., not designated for publication) (noting that although article 64.03(b) provides that the trial court cannot find that identity was not an issue in the case solely on the basis of a guilty plea, this does not mean that the trial court cannot consider the plea along with the remainder of the record).

A convicted person is not entitled to DNA testing when the testing would "merely muddy the waters." *Ex parte Gutierrez*, 337 S.W.3d 883, 901 (Tex. Crim. App. 2011).[11] That is, the mere presence of a third party's DNA at a crime scene does not establish a reasonable probability of an appellant's innocence when it does not explain away all of the other evidence pointing to his guilt. *White v. State*, No. 02-05-00041-CR, 2006 WL 59356, at *2 (Tex. App.—Fort Worth Jan. 12, 2006, pet. ref'd) (mem. op., not designated for publication) (citing *Skinner v. State*, 122 S.W.3d 808, 812 (Tex. Crim. App. 2003) (op. on reh'g)). And even if DNA test results could be exculpatory, they are considered in the context of all other relevant evidence and must conclusively outweigh all other evidence of the

---

[11]In *Gutierrez*, the court of criminal appeals held that the trial court did not err by denying DNA testing when a third-party match to the biological evidence would not have overcome the overwhelming evidence of appellant's direct involvement in a multi-assailant murder. 337 S.W.3d at 901–02. And in contrast to single-assailant sexual assault cases, none of the evidence that Hill seeks to have tested would establish his innocence. *Cf. Esparza v. State*, 282 S.W.3d 913, 922 (Tex. Crim. App. 2009); *Blacklock v. State*, 235 S.W.3d 231, 232–33 (Tex. Crim. App. 2007).

convicted party's guilt. *Mejia v. State*, No. 14-08-01047-CR, 2010 WL 2650021, at *3 (Tex. App.—Houston [14th Dist.] July 6, 2010, no pet.) (mem. op., not designated for publication) (citing *Wilson v. State*, 184 S.W.3d 481, 485 (Tex. Crim. App. 2006), and *Jacobs v. State*, 115 S.W.3d 108, 113 (Tex. App.—Texarkana 2003, pet. ref'd)).

## B. Analysis

Hill argues that although he pleaded guilty, the evidence connecting him to the murder "is purely circumstantial." The State responds that the trial court found that identity was not and is not in issue based, in part, on Hill's confessions to Gipson, Densmore, and Youngblood, and based on corroboration by Hill's debit card records and the Walgreens electronic journals showing that Hill had been at a Walgreens two blocks from the victim's home. Additionally, the State responds, Jakeeta Taylor identified Hill as the man she saw at Braum's, and the trial court was entitled to disbelieve the affidavit provided by Hill's wife with regard to the events of the day of the murder.

Considering this evidence, as well as the rest set out in extensive detail above in our factual recitation, we agree with the State because here, there is no indication that I.S.'s assailant was injured when neither blood nor tissue-like material was detected in the fingernail cuttings taken from her corpse. Therefore, the blood stains on the rocker cushion and from the front door are more probably from I.S., whom the deputy medical examiner testified bled to death, instead of her assailant. Further, the absence of Hill's DNA and the presence of third-party

24

DNA in swabs from the public pay phone will not exonerate Hill when several hours had passed before the police secured the pay phone.[12] And the absence of Hill's DNA from the bathtub hairs would not exonerate Hill in light of the substantial other evidence corroborating his conviction and supporting the denial of his motion for DNA testing, as set out above. Therefore, we overrule Hill's sole point because testing any of the four items for which he requested DNA testing would solely "muddy the waters." *See Gutierrez*, 337 S.W.3d at 901; *see also White*, 2006 WL 59356, at *2–3 (affirming the denial of appellant's motion for DNA testing when even though testing of swabs of the sexual assault complainant's mouth might provide evidence of another man's DNA, it did not explain away the other evidence of appellant's guilt).

## IV. Conclusion

Having overruled Hill's sole point, we affirm the trial court's judgment.

PER CURIAM

PANEL: MCCOY, DAUPHINOT, and WALKER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: September 13, 2012

---

[12]Also, in light of the discrepancy between the pay phone's records and Detective Nutt's testimony, there appears to be a question as to whether that particular pay phone was used to call the victim's house. However, this discrepancy in the pay phone's use makes it even less likely that the absence of Hill's DNA would be exculpatory.

25